**NOT RECOMMENDED FOR PUBLICATION**
File Name: 07a0118n.06
Filed: February 14, 2007

No. 06-1013

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAWN COOPER, Personal Representative of
the Estate of DEMITRIUS MORTON,
Deceased,

      Plaintiff-Appellant,

v.

COUNTY OF WASHTENAW, CITY OF ANN
ARBOR, ANTHONY WOODFORD,
Washtenaw County Sergeant, PAMELA
RACITI, Washtenaw County Officer,
EUGENE HAHN, Washtenaw County Officer,
MICHAEL WATCHOWSKI, Ann Arbor Police
Officer, STEVE LAWRENCE, Ann Arbor
Police Officer,

      Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

                                               /

BEFORE:    CLAY, ROGERS, and SUTTON, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff Dawn Cooper, personal representative of the estate of

Demitrius Morton ("Morton"), a deceased prisoner at Washtenaw County Jail, appeals the district

court order granting summary judgment in favor of Defendants Washtenaw County, the City of Ann

Arbor, and all officers named individually as Defendants (collectively "Defendants"). The district

court dismissed Plaintiff's 42 U.S.C. § 1983 claim alleging Defendants violated Morton's Eighth Amendment rights by acting with deliberate indifference to his known risk of suicidal behavior. For the reasons that are set forth below, we **AFFIRM** the district court's decision granting summary judgment as to Defendants Lawrence, Woodford, Hahn, Raciti, and the County of Washtenaw; we **REVERSE** the grant of summary judgment as to Defendants Watchowski and the City of Ann Arbor.

## BACKGROUND

The details of this case are tragic. On March 3, 2003, thirty-five year old Demetrius Morton pled guilty to domestic assault and battery. Morton was released on personal recognizance and ordered to return to court on April 3, 2003 for sentencing. Morton failed to appear on April 3, 2003 and a bench warrant was issued for his arrest. On June 3, 2003 he was arrested by Dearborn police, and an arrangement was made to transfer him to the custody of the Ann Arbor police. During the exchange, Morton attempted to escape and was caught. The capture prompted him to become violent toward the arresting officers and toward himself. During his transport to Ann Arbor, he banged his head on the safety glass of the patrol vehicle and stated that he wanted to kill himself. Reacting to his violent behavior, Ann Arbor police transported Morton to the University of Michigan for psychological evaluation to determine if he needed to be hospitalized as he presented a danger to himself and others. Morton tested positive for cocaine and his blood alcohol level was found to be .363, which is over four times the legal limit for operating a motor vehicle. University medical specialists concluded that hospitalization was unnecessary and that Morton's violent behavior was

the result of his drug and alcohol use. Morton was released from the University Hospital the same day and taken to his arraignment.

At the arraignment, Morton once again reacted violently when he was told he would not be released while he awaited his sentencing hearing set for June 12, 2003. He banged his head on the table and yelled that he wanted to kill himself. Morton had to be physically restrained and escorted out of the courtroom by the officers present. Despite the recommendation for the University hospital that Morton did not present a danger to himself, the judge ordered Morton to be placed on suicide watch until sentencing. Officer Watchowski of the Ann Arbor police, one of the defendants in this action, was present at this arraignment. Defendant Watchowski testified that he did not hear the court place Morton on suicide watch. However, he admitted that it is customary for him to have received a copy of the court disposition and that he likely received one in this case as well. Further, while he claimed that he could not remember if he read it or not, he admitted that it is likely that if he received the court disposition then he would have read it. The Ann Arbor police transported Morton to Washtenaw County jail, where he would be housed until sentencing. Defendant Watchowski was not one of the transporting officers.

Defendant Deputy Raciti booked Morton when he arrived at the Washtenaw County Jail on June 3, 2003. Defendant Raciti placed Morton on suicide watch pursuant to the court's order. This was the sixth time Morton had been an inmate at Washtenaw County Jail. During three of his previous incarcerations at the jail he had been placed on suicide watch. Placing Morton on suicide watch consisted of placing him in an observation cell under 24-hour observation, where he was housed from June 3, 2003 until he was transported to his sentencing hearing on June 12, 2003. The

3

observation cells are rooms with glass walls so that the prisoner can be observed constantly. Morton was also given a "bam bam" gown to wear.[1] These gowns are given to inmates on suicide watch, as well as inmates who have other special medical needs. The observational cells are additionally used both to house inmates on suicide watch and inmates who need to be observed for other medical and psychological needs. Over the course of his nine day stay, Morton was given consistent medical evaluations and "was cleared of all alcohol/narcotic withdrawals" on June 8, 2003.

Defendants Officers Michael Watchowski and Steve Lawrence, both of whom were Ann Arbor police officers, were the transport officers on June 12, 2003 who were responsible for taking Morton to his sentencing hearing. When the officers arrived, both Defendants Officer Pamela Raciti and Sergeant Anthony Woodford of Washtenaw County were on duty at the county jail. When Defendants Watchowski and Lawrence inquired as to how Morton was doing, Defendants Raciti and Woodford informed them that Morton was "doing fine" and he was "alright to be transported as far as [Defendant Woodford] kn[ew]." (J.A. at 395). Neither Defendant Raciti nor Defendant Woodford told either Defendant Watchowski or Defendant Lawrence that Morton was on suicide watch.

When they first arrived, Defendants Watchowski and Lawrence saw that Morton was being held in an observational cell and saw him wearing a bam bam gown. Before he was released into the custody of Defendants Watchowski and Lawrence, Morton was changed out of the bam bam

---

[1]Defendants' counsel explained during oral argument that "bam bam" gowns are so named for the Flintstones character "Bam Bam." The name refers to the fact that the jail's bam bam gowns are flimsy, one-piece gowns that are designed to tear apart upon the exertion of any pressure so that they cannot be used in a suicide attempt.

gown and into a white uniform, consisting of white pants and a white shirt. This uniform is issued to inmates who have special needs, which can include suicidal tendencies, drug or alcohol problems, or medical conditions. Defendant Eugene Hahn, Washtenaw County Corrections Officer, was responsible for preparing the transportation log concerning Morton's June 12, 2003 transportation to the sentencing hearing. Defendant Hahn had no direct contact with Morton or the Ann Arbor Defendants. Washtenaw Deputy Pilarski claimed that he informed Defendant Watchowski that Morton was on suicide watch before Watchowski left the county jail, and Corporal Crowell confirmed that he heard this conversation. Defendant Watchowski claimed that he cannot remember whether he was told this or not.

Defendants Watchowski and Lawrence spoke with Morton on the ride to the sentencing hearing and according to them he "seemed . . . normal" and there was "no indication" he had any suicidal tendencies. (J.A. at 397). Morton arrived at the courthouse without incident. When Morton was sentenced to ninety-three days in jail, he accepted the sentence calmly. Defendants returned Morton to a holding cell after the sentencing until they could transport him back to the jail. Defendants left Morton for a little over an hour unsupervised. When they returned, they discovered that he had hanged himself with his shirt in the cell.

Plaintiff brought this action, claiming that Defendants showed deliberate indifference to the suicidal tendencies of Morton. Defendants moved for summary judgment. Defendants Watchowski and Lawrence both admitted that suicide risk was a major concern when inmates were seen wearing bam bam gowns, but they further testified that other reasons were equally possible for the gown. Defendant Raciti confirmed that inmates are given this gown in situations other than potential

5

suicide risks. Defendants also testified that inmates were placed in observational cells for reasons other than suicide prevention. Plaintiff introduced no testimony that contradicted the assertions that suicide risk is only one of several reasons an inmate may be held in an observation cell or wear a bam bam gown.

The district court noted that Plaintiff was unable to allege facts indicating that Defendants acted any more than negligently in their interactions with respect to Morton's suicide risk. The court emphasized that the standard for deliberate indifference is whether the official "knows of and disregards an excessive risk to inmate health or safety." (J.A. at 395). The district court reasoned that with respect to Defendant Woodford, Plaintiff offered no evidence that would tend to indicate that Plaintiff met the requisite standard. Because Plaintiff's argument with respect to Defendant Woodford was that he failed to tell Defendants Watchowski and Lawrence that Morton was on suicide watch, the district court reasoned that this was simple negligence. With respect to Defendant Raciti, Plaintiff once again argued that her failure to inform the Ann Arbor police that Morton was suicidal constituted a violation of Morton's Eighth Amendment rights. Again, the district court reasoned that this amounted only to negligence. The district court pointed out that Plaintiff failed to make any argument to support the allegation that Defendant Hahn showed deliberate indifference toward Morton, because he never had any direct contact with him. The court analyzed Defendants Watchowski and Lawrence together and concluded that, assuming Plaintiff successfully alleged that they had observed enough indicia of suicidal behavior to have drawn the inference, Plaintiff was unable to prove that they had actually drawn the inference. Finally, the court pointed out that Plaintiff's "failure to train" argument against Defendants Washtenaw County and the City of Ann

Arbor was meritless because § 1983 claims cannot grant relief on an allegation of failure to train unless Plaintiff alleged that the County and the City themselves engaged in the constitutional violation. Thus, the district court granted summary judgment in favor of all Defendants. Plaintiff timely filed a Notice of Appeal of this order.

**DISCUSSION**

I.      **The district court improperly granted summary judgment with respect to Defendant Watchowski, but properly granted summary judgment with respect to the other individual Defendants**

A.      **Standard of Review**

This Court reviews a district court's grant of summary judgment *de novo*. *Blackmore v. Kalamazoo*, 390 F.3d 890, 894-95 (6th Cir. 2004). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. While all inferences must be drawn in favor of the nonmoving party, this Court is under no obligation to imagine favorable facts where the nonmoving party has alleged none. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on

7

which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.      Standard for a § 1983 Claim

Section 1983 does not alone confer rights upon an individual.  Instead, it is a vehicle to assert violations of constitutional rights guaranteed elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94, (1989). Thus, in order to successfully bring a § 1983 claim, a plaintiff must allege 1) the violation of an underlying constitutional right by; and 2) a state actor who committed the violation while acting under the color of law.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979).

In the present case, Plaintiff alleges that by showing deliberate indifference to Morton's demonstrated suicidal tendencies, Defendants violated his Eighth Amendment rights.  (Pl.'s Brief at 3).  Plaintiff properly bases the underlying violation upon the Eighth Amendment because Morton was a convicted prisoner at the time of his suicide.  "[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one. . . ." *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Further, "this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs." *Perez v. Oakland County*, 466 F.3d 416, 423(6th Cir. 2006).  Plaintiff is, therefore, able to meet the first requirement for alleging a § 1983 claim.  Additionally, Plaintiff names two municipalities and four agents of the state as Defendants.  Accordingly, it is undisputed that their actions were undertaken under color of law.  Thus, this § 1983 claim is properly formulated.

### C.      Deliberate Indifference

The question before us is whether there exists a triable issue of fact over whether Defendants discharged their constitutional responsibilities while Morton was in custody. "[T]he Constitution gives governments considerable leeway when it comes to the day-to-day challenges of managing a prison and erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006). Accordingly, deliberate indifference involves two distinct steps. First, a plaintiff must "establish[] that 'the official knows of and disregards an excessive risk to inmate health or safety,' which is to say 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This requirement comprises the constitutional violation question and contains both an objective and subjective element. Once a plaintiff is able to make the initial showing that there was in fact a constitutional violation, a defendant may still avoid liability if the defendant is entitled to qualified immunity. To overcome a claim of qualified immunity, plaintiff must show that "the right at issue was . . .'clearly established' at the time of the violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

### 1.      Constitutional Question

"[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,' and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.'" *Perez*, 466 F.3d at 424 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)). This Court has defined "[a] serious medical need [as] 'one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). It is well-established in this Circuit that suicidal tendencies are considered "serious medical needs" for the purposes of this analysis. *See, e.g.*, *Horn*, 22 F.3d at 660; *Barber v. City of Salem, Ohio*, 953 F.2d 232, 239-40 (6th Cir. 1992).

There are two distinct prongs of the deliberate indifference standard: An objective component and a subjective component. First, the medical need "must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 835. As we have stated, it is beyond dispute that suicidal tendencies meet this objective component. *Horn*, 22 F.3d at 660. The subjective component, on the other hand, requires facts that indicate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

Thus, the subjective component actually has three prongs embedded within it. First, the plaintiff must show that the official subjectively perceived the facts that gave rise to the inference of the risk. *Id.* Then, the plaintiff must show that the official actually drew the inference, and, importantly, not just that he or she should have done so. *Farmer*, 511 U.S. at 839; *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). Finally, the plaintiff must show that the official consciously disregarded the perceived risk. *Farmer*, 511 U.S. at 839.

The constitutional question is further complicated by the oft-repeated caveat "that deliberate indifference entails something more than mere negligence." *Farmer*, 511 U.S. at 835. Precisely how much more is required remains difficult to determine. "Deliberate indifference requires a

degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). In *Farmer*, the Court indicated that the line between these two concepts is marked by actual knowledge. The Court defines deliberate difference as criminal recklessness and notes that "[t]he criminal law. . . generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Farmer*, 511 U.S. at 836-837. The line between negligence and deliberate indifference is particularly difficult to draw when the risk at issue is suicide because the officials will necessarily be accused of a failure to act, which usually falls in the domain of negligence. We have clarified that the proper inquiry in a case where an inmate has committed suicide is "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)).

Noticeably, this is a difficult standard to meet at the summary judgment stage. Thus, this Court must adhere to a standard that simultaneously retains a difference between negligence and deliberate indifference while not rendering it prohibitively difficult for a plaintiff to succeed at the summary judgment stage. This Court has held that

> [a]lthough the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways." *Farmer*, 511 U.S. at 842. Thus, the Supreme Court noted that it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. *Id*. at 842. Moreover, the Court warned, a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying

11

facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id*. at 843 n.8.

*Comstock*, 273 F.3d at 703. Accordingly, we do not demand that a plaintiff prove that he or she will ultimately be successful on the § 1983 claim at this stage in order to survive summary judgment. Instead, a plaintiff need only to "allege facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." *Id*. This satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff to survive summary judgment without proving his or her entire case.

In *Perez*, we were faced with a situation similar to the one before us presently. In that case, the plaintiff appealed the grant of summary judgment dismissing the plaintiff's § 1983 claim alleging deliberate indifference when the plaintiff's son, Perez, killed himself while being housed at the Oakland County jail. *Perez*, 466 F.3d at 419. One of the individual defendants who was named by plaintiff was Rice, who was the counselor assigned to work with Perez while he was in custody. *Id*. The plaintiff alleged that Rice's decision to remove Perez from an observational cell with other inmates amounted to deliberate indifference because she had previously deemed him to be suicidal and placed him on suicide watch. *Id*. at 424-25. The defendant responded that she did not disregard Perez's psychological needs, but that she genuinely did not perceive Perez to be suicidal any longer. *Id*.

The district court found that a genuine issue of fact remained as to whether Rice disregarded the risk and this Court agreed. In that case, we focused on the fact that the defendant had been in direct contact with Perez in the weeks leading up to his death. Because she had been the one to place

him on suicide watch, we concluded that she had actual knowledge that Perez had exhibited suicidal tendencies. *Id.* Thus, a triable issue of fact remained as to whether the decision to discharge him from suicide watch and place him in an unmonitored cell surpassed mere negligence and amounted to deliberate indifference. In so concluding, we held that when "[v]iewing this evidence in the light most favorable to [plaintiff], this evidence can be construed as demonstrating that Rice had the subjective knowledge, at least at times, that Perez posed a risk of suicide." *Id.* at 425. Thus, in *Perez*, we held that once actual knowledge of the risk could be shown at the summary judgment stage, the question of whether there was conscious disregard of that risk was to be determined by the jury. *Id. See also*, *Clark-Murphy,* 439 F.3d at 289 ("For summary-judgment purposes, we hold only that these 11 defendants could have perceived a substantial risk of serious harm to Clark. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial.")

## 2. Qualified Immunity

After a plaintiff makes the necessary showing with respect to the constitutional question, a defendant may still assert qualified immunity to succeed on summary judgment. *Perez*, 466 F.3d at 426. "The philosophy behind the doctrine of qualified immunity 'is a desire to avoid the substantial costs imposed on government, and society, by subjecting officials to the risks of trial.'" *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002) (quoting *Vaughn v. United States Small Bus. Admin*., 65 F.3d 1322, 1326 (6th Cir. 1995)). The purpose of the doctrine is to shield "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (2004). As we

have noted, the question of whether qualified immunity exists involves a two-part inquiry. *Perez*, 466 F.3d at 426.

The initial question before the court in a qualified immunity inquiry is whether the facts, taken in the light most favorable to the plaintiff, indicate that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201(2001). If the answer to this first question is no, then the inquiry is ended. In other words, the first step of the qualified immunity analysis is determining whether the plaintiff has proved the constitutional question. If the plaintiff can show that a constitutional violation occurred, we must ask whether the constitutional right at issue was "clearly established" at the time of the violation. *Id*. at 202. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. Importantly, qualified immunity is not analyzed as an affirmative defense. When a defendant claims qualified immunity, it creates a hurdle for the plaintiff to surmount before he or she can overcome the claim. The burden of showing that a right was clearly established falls wholly on the plaintiff. *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999). The plaintiff must further show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, if reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be granted. *Key*, 179 F.3d at 1000.

A plaintiff must make the showing that a right was clearly established by looking "principally to the law of this circuit and to the Supreme Court." *Perez*, 466 F.3d 416. "However, we have held that the lack of Supreme Court or Sixth Circuit precedent 'is not a sufficient condition for concluding

that the law is unclear on the subject and [thus that] qualified immunity must be granted to a defendant.'" *Id*. (quoting *McCloud v. Testa*, 97 F.3d 1536, 1556 (6th Cir. 1996)). "[T]he decisions of other courts can also clearly establish the law[,] but they must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998) (internal citation omitted). "There need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work. Specifically, the Court has held that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). Guided by Supreme Court precedent, this Court has held that "under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d at 343, 347 (6th Cir. 1992).

**D.    Application to Individual Defendants**[2]

---

[2]Defendant Hahn was not mentioned in Plaintiff's brief or in oral argument. Therefore, we deem any argument focusing on his actions waived.

### 1. Defendant Watchowski

Defendant Watchowski was present at Morton's original hearing on June 3, 2003 when the court ordered him placed on suicide watch. Defendant Watchowski claimed that he did not hear the court place Morton on suicide watch, but that he likely received a copy of the court disposition, and if he received it he likely read it. Deputy Pilarski claimed that he informed Defendant Watchowski that Morton was on suicide watch. This was confirmed by Corporal Crowell, and Defendant Watchowski does not remember whether he was informed by Pilarski or not. Because Defendants move for summary judgment, we must draw all inferences in favor of Plaintiff. Thus, we will assume based on this evidence that Defendant Watchowski was put on notice that Morton was on suicide watch while he was at Washtenaw County Jail. When Defendant Watchowski appeared on June 12, 2003 to take Morton to his hearing, Morton was wearing a bam bam gown and was being housed in an observational cell. While the officers on duty told Watchowski that Morton was doing fine, these facts all taken together indicate that Watchowski had at least perceived enough facts to give rise to an inference of the risk, which is the first prong of the subjectivity component for deliberate indifference. *Comstock*, 273 F.3d at 703.

The next question is whether Watchowski actually drew the inference. As this Court stated in *Comstock*, this Court may infer knowledge from circumstantial evidence. *Id.* Because Defendant Watchowski was on notice that Morton was a suicide risk, it is appropriate to presume that Watchowski had the requisite knowledge. We need not address whether Plaintiff has alleged facts pertaining to the question of conscious disregard of the risk. As we held in *Perez* and its progeny, where there is evidence of actual knowledge of the risk, conscious disregard need not be explicitly

alleged in order to survive summary judgment. *Perez*, 466 F.3d at 425; *Clark-Murphy,* 439 F.3d at 289. Therefore, we conclude that Plaintiff alleged sufficient facts to overcome summary judgment.

Defendant Watchowski alternatively argues that he is entitled to qualified immunity. Because Defendant Watchowski's actions amounted to a constitutional violation, the next question we must determine is "whether [Defendant Watchowski] had 'fair warning' that [his] actions were unconstitutional." *Cummings*, 418 F.3d at 687. We have previously addressed this question. "[O]nce a prisoner has been deemed suicidal, it is clearly established that the prisoner is entitled to continuing medical treatment." *Perez*, 466 F.3d at 428 (citing *Comstock*, 273 F.3d at 702-03). Thus, Defendant had fair warning that his actions would constitute a constitutional violation. Defendant failed to show that any rational trier of fact would conclude that he was entitled to qualified immunity and therefore summary judgment was inappropriate with respect to Defendant Watchowski.

### 2. Defendant Lawrence

While Defendant Lawrence and Defendant Watchowski were both Morton's transport officers, their degree of liability differs in that Defendant Lawrence had no actual knowledge that Morton was on suicide watch. The crux of Plaintiff's argument is that Defendant Lawrence *should* have known that Morton had a high risk of hurting himself because of the facts Defendant Lawrence perceived. Plaintiff argues that Defendant Lawrence knew Morton was on a suicide watch because of the bam bam gown in which he was outfitted, the observational cell in which he had been held, and the white uniform he was given upon his release. However, the record is replete with other explanations for each of those observations besides the suicide watch explanation. Because each of

17

those precautions could have indicated Morton had other special needs and needed to be observed, we cannot conclude that perceiving them put Defendant Lawrence on notice that Morton was suicidal. Further, Plaintiff's expert witness testimony shows at most that Defendant Lawrence should have known that Morton was suicidal, which is insufficient for a deliberate indifference claim. Finally, Plaintiff argues that the fact that Watchowski violated Ann Arbor security procedures by not at least checking on Morton after the requisite thirty minutes should give rise to the presumption that he acted unconstitutionally. However, the Supreme Court has foreclosed this argument. A violation of internal policy does not *ipso facto* give rise to a presumption of unconstitutionality. *Davis*, 468 U.S. at 194. Thus, Lawrence was properly granted summary judgment.

### 3. Defendant Raciti

Defendant Raciti was responsible for placing Morton under suicide watch, so it is beyond dispute that she perceived the requisite facts that gave rise to an inference of a risk and that she actually knew that Morton was on suicide watch. Further, she did not warn either Defendant Watchowski or Defendant Lawrence, who would be responsible for monitoring Morton, that he was under observation as a suicide risk. Contrary to the assertion by Judge Rogers' concurrence that there is some dispute regarding this fact, there is absolutely no testimony on the record indicating that she ever gave such a warning. Despite these facts as understood by the lead opinion, we conclude that, as explained in Judge Rogers' concurrence, the district court properly granted summary judgment in favor of Defendant Raciti.

As the Supreme Court has held, the right that is violated must be clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, while it is well-established that an inmate who has exhibited suicidal tendencies is entitled to medical treatment, it must have been clear that Defendant Raciti's deliberate indifference deprived him of that treatment in order for her to be liable. Too many triable issues of fact remain with respect to whether Defendant Raciti knew her failure to warn would subject Morton to the injury he experienced.

Contrary to Judge Rogers' concurrence, the record is completely silent with respect to whether Defendant Raciti actually knew that Defendant Watchowski had attended Morton's arraignment. Without this knowledge, it would be illogical to relieve Defendant Raciti of her duty to warn Morton's transport officers that he was a suicide risk so that they could continue to closely observe him.

Even if we were to assume, *arguendo*, that Defendant Raciti was aware that Defendant Watchowski attended Morton's arraignment, material facts would remain in dispute about Defendant Raciti's potential liability. Defendant Raciti had no basis to assume that Defendant Watchowski remembered or even heard the judge place Morton on suicide watch nine days earlier. Further, the fact that Defendant Watchowski may have been aware that Morton was placed on suicide watch on June 3, 2003 does not address whether Defendant Raciti should have assumed Defendant Watchowski knew Morton was still on suicide watch on June 12, 2003. Morton's suicidal behavior was attributed to alcohol and drug use at his arraignment; by June 12, 2003, he had been cleared of all alcohol and narcotic withdrawal. Thus, Defendant Raciti had no reason to refrain from informing

Defendant Watchowski that Morton, although he was sober, still posed a suicide risk. Finally, because Defendant Raciti did not know whether Defendant Watchowski would be the officer charged with observing Morton, she may have had a duty to insure that Defendant Lawrence knew of Morton's suicidal tendencies as well. Contrary to the concurrence, the record is clear that only Defendant Watchowski, and not Defendant Lawrence, attended Morton's arraignment. (J.A. at 103-07; J.A. at 162-63). Clearly, many material facts remain in dispute about whether Defendant Raciti had "fair warning" that her failure to warn would result in a violation of Morton's constitutional rights. *Cummings*, 418 F.3d at 687. These remaining issues of fact indicate that it would be entirely possible for a rational trier of fact to find that Defendant Raciti acted with deliberate indifference toward Morton. Thus, summary judgment was inappropriate with respect to Raciti.

In order to reach the contrary conclusion, the concurrence has impermissibly engaged in its own fact-finding. The concurrence concludes that Defendant Raciti cannot be liable "because there is no evidence that Raciti knew that Watchowski and Lawrence were ignorant about or would ignore signs of Morton's suicide risk." However, this sweeping statement assumes facts wholly unsupported by the record. Contrary to the assertions made by the concurrence, it is very much disputed as to whether Defendants Watchowski and Lawrence observed signs indicating that Morton might be a suicide risk.

According to Defendant Raciti's testimony, she "assumed" that Defendants Watchowski and Lawrence knew that Morton was on suicide watch, but she did not know that for sure. (J.A. at 162). She based her assumption on the fact that the information could be found in the court disposition, on the fact that Morton was being housed in an observational cell, and on the fact that she was

outfitted in a bam bam gown. However, she admitted that she did not know whether either Defendants Watchowski or Lawrence actually read the court disposition. Importantly, she also admitted that there were reasons other than being on suicide watch that a person might be held in an observational cell and be outfitted in a bam bam gown. Thus, the issue of whether Defendants Watchowski and Lawrence actually observed any signs that put them on notice that Morton was a suicide risk is in dispute. Because that issue goes to the very heart of the question of Defendant Raciti's liability, summary judgment should not be granted.

The concurrence refers to the connection between Raciti's actions and Morton's death as "tenuous" and essentially holds that only a direct causal effect of injuries can amount to deliberate indifference. However, such a holding improperly injects a proximate cause discussion into our deliberate indifference analysis. We have previously held that while proximate cause may be necessary "to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner or pretrial detainee's 'affliction is seemingly minor or non-obvious,' no such evidence is required where the individual had a 'serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). Specifically, in *Blackmore*, we held:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

21

*Id.* We have also previously held that once a prisoner has been deemed suicidal that prisoner is said to have this type of obvious and serious need for medical care. *Perez v. Oakland County*, 466 F.3d 416, 428 (6th Cir. 2006); *Comstock v. McCrary*, 273 F.3d 693 (2001). Accordingly, there need not be a showing of proximate cause in order to hold Raciti liable.

Further, even if a showing that Raciti's failure to warn was the proximate cause of Morton's death were required, such a requirement would weigh strongly against the granting of summary judgment. As we have explicitly stated in the past, "[p]roximate cause, and its underlying foreseeability inquiry, is a question of fact for the jury." *James v. Meow Media, Inc.*, 300 F.3d 683, 692 (6th Cir. 2002). Nevertheless, we conclude that summary judgment was appropriate with respect to Defendant Raciti for the reasons stated in the concurrence.

### 4. Defendant Woodford

Because Defendant Woodford was not responsible for placing Morton on suicide watch, Plaintiff has failed to make a showing that Defendant Woodford drew the inference that Morton was a suicide risk. Without facts alleging that Defendant Woodford had the requisite knowledge of Morton's suicidal tendencies, he cannot be liable for deliberate indifference. Plaintiff's argument amounts to an allegation that he should have made the inference, which is insufficient for the reasons we discussed above with respect to Defendant Lawrence. Thus, Defendant Woodford was entitled to summary judgment.

**II. The district court improperly granted summary judgment with respect to Defendant City of Ann Arbor, but properly granted summary judgment with respect to Defendant County of Washtenaw**

In an effort to shield municipalities from liability for § 1983 claims, the Supreme Court created a high burden for a plaintiff to meet to bring a § 1983 claim for failure to train. The Court held that

> [a] city is not liable under § 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." *Monell* will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury.

*City of Canton v. Harris*, 489 U.S. 378 (U.S. 1989). This Court has interpreted that standard and announced a three-part test to aid in the determination. This Court has held that "[t]o succeed on a failure to train or supervise claim [under a § 1983 theory], the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). The inquiry, however, must extend beyond the question of whether the individual officers involved were poorly trained. The appropriate question is "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *City of Canton*, 489 U.S. at 390. "Plaintiff must do more than point to something the city could have done to prevent the unfortunate incident." *Kahlich v. City of Grosse Pointe Farms*, 120 Fed. Appx. 580, 585 (6th Cir. 2005) (unpublished) (citing *City of Canton*, 489 U.S. at 392 (citation

omitted). However, before this Court can apply the *Ellis* test, the plaintiff must first establish that the agents of the municipality have violated a constitutional right. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Thus, this claim is inextricably linked to the plaintiff's first claim: If the individual defendants have violated no constitutional right, the municipality cannot be liable under § 1983 for a failure to train. *Id.*

In the present case, Defendant Watchowski's and Defendant Raciti's behavior arguably constitute constitutional violations. Whether the County of Washtenaw and the City of Ann Arbor may be liable is governed by the *Ellis* test. Because the district court concluded that there were no underlying constitutional violations, it summarily dismissed Plaintiff's claims against the municipalities without applying the *Ellis* test. Because we conclude that Watchowski's behavior constituted a constitutional violation, we shall remand the issue of the liability of the City of Ann Arbor to the district court to determine whether a rational trier of fact can conclude that Watchowski's deficient behavior can be fairly characterized as a "city policy." *City of Canton*, 489 U.S. at 390. This Court should also remand the issue of the liability of the County of Washtenaw to the district court for the application of the *Ellis* test and further factual development. However, the County of Washtenaw shall be dismissed by the panel majority pursuant to the reasoning set forth by Judge Rogers' concurrence.

We remand to the district court the issue of the liability of the City of Ann Arbor; however, the dismissal of the County of Washtenaw pursuant to summary judgment will be affirmed based upon the holding of the majority constituted by Judges Rogers and Sutton as to that issue.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment with respect to Defendants Lawrence, Woodford, and Hahn, and **REVERSE and REMAND** with respect to Defendants Watchowski and the City of Ann Arbor. Summary judgment with respect to Defendants Raciti and the County of Washtenaw is **AFFIRMED** for the reasons stated in Judge Rogers' concurrence.

**Rogers, J., concurring**: I concur in the lead opinion except with regard to defendant Raciti, and therefore do not join Part I.D.3. and the portion of Part II dealing with Washtenaw County's potential liability under *Ellis v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006).

On June 12, 2003, when Officers Watchowski and Lawrence arrived to pick up Morton, Officer Watchowski asked Corrections Officer Pamela Raciti how Morton was doing, to which Raciti responded that Morton was doing fine. JA 139. Raciti did not observe any problems from Morton during his nine-day period of incarceration, JA 157, and observed him smiling at one point. JA 160. There is some evidence that, during this conversation, Officer Raciti warned Officers Watchowski and Lawrence that Morton was on suicide watch. JA 164. The record, however, is not clear on this point, as Officer Raciti testified that she did not specifically remember warning the other officers, JA 164, and this disputed fact at this point should be resolved in the plaintiff's favor.

Assuming that Officer Raciti did not warn Officers Watchowski and Lawrence of Morton's suicide risk, Officer Raciti observed three significant facts that would warrant her reasonable belief that an experienced transportation officer, like Watchowski or Lawrence, would have been aware of the risk. First, the court ordered that Morton be put on suicide watch and Raciti believed that the court order was in the file that Watchowski and Lawrence received. (Officer Watchowski, as it turns out, was present in the courtroom when the judge instructed authorities to put Morton on suicide watch.) Second, Raciti believed that Watchowski and Lawrence knew that Morton was in an observation cell. Third, Raciti believed that Watchowski and Lawrence knew that Morton wore a

bam-bam uniform, which, combined with the other two factors, suggested that Morton was on suicide watch.

These facts demonstrate a reasonable belief on Officer Raciti's part that Officers Watchowski and Lawrence should have been aware of Morton's suicide risk. Even if such a belief was not reasonable, the facts at least preclude the inference that Officer Raciti was deliberately indifferent by failing to warn Officers Watchowski and Lawrence of Morton's risk. Raciti's reliance on Officers Watchowski and Lawrence to deal with Morton's suicide risk might have been mistaken, or even careless. (There is a dispute as to whether Officers Watchowski and Lawrence were aware of the risk.) Nevertheless, Raciti's actions cannot be determined to have sunk to the level of deliberate indifference.

Raciti's failure to warn Watchowski and Lawrence of Morton's suicide risk amounted, at most, to negligence because there is no evidence that Raciti knew that Watchowski and Lawson were ignorant about or would ignore signs of Morton's suicide risk. In essence, Cooper claims that an officer can be deliberately indifferent to a risk that others would be deliberately indifferent to a risk. The Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), however, instructs us not to find an officer liable for a tenuous connection similar to the one in this case.