RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

WILLIAM O. CASS, Administrator of the Estate of Derrick J. Jordan,

     *Plaintiff-Appellant,*

 *v.*

No. 13-4409

CITY OF DAYTON; DAYTON POLICE DEPARTMENT; DAVID HOUSE; JOHN DOE,

     *Defendants-Appellees.*

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:12-cv-00248—Timothy S. Black, District Judge.

Argued: August 8, 2014

Decided and Filed: October 16, 2014

Before: GIBBONS and McKEAGUE, Circuit Judges; LAWSON, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Matthew C. Schultz, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellant. Kelly M. Schroeder, FREUND, FREEZE & ARNOLD, Dayton, Ohio, for Appellees. **ON BRIEF:** Matthew C. Schultz, Dwight D. Brannon, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellant. Kelly M. Schroeder, Neil F. Freund, FREUND, FREEZE & ARNOLD, Dayton, Ohio, for Appellees.

───────────

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   After a "buy-bust" operation took an unexpected turn, Detective David House of the Dayton City Police Department shot and killed Derrick Jordan.  Jordan, not the intended target of the bullet, sat in the front passenger seat of a vehicle that, moments before the shot was fired, had been driven into two officers in an attempt to escape.  Jordan's estate brought suit under 42 U.S.C. § 1983, alleging that House used excessive force in violation of the Fourth Amendment and that the City failed to train and supervise its employees adequately.  Jordan's estate also asserted claims under Ohio law.  The district court awarded summary judgment to the defendants on all claims and Jordan's estate appeals.  For the following reasons, we affirm.

**I.**

This case arises out of a May 16, 2008, "buy-bust" operation orchestrated by Detective James Mullins of the Dayton Police Department Special Investigations Division Drug Unit.  The operation was based on information received from a confidential informant, who was to purchase an ounce of crack cocaine from Robert Moore.

That evening, Mullins briefed the following team members on the operation: Sergeant Mark Spiers, Sergeant Brian Johns, Detective David House, Detective Keith Coberly, Detective Dennis Murphy, Detective Doug Hall, Detective Joe St. Clair, Detective Tommy Harshman, Officer Mark Ponichtera, Officer Ron Velez, and Officer Tom Oney.  Mullins advised the team that the informant had ordered an ounce of crack cocaine, that Moore was a known drug dealer, and that Moore was known to be armed with a gun.  Mullins explained that it was to be a two-part operation.  The first part called for officers to arrest Moore following a traffic stop.  If that was unsuccessful, Mullins would take the informant to the Econo Lodge on Edwin C. Moses Blvd. where the officers would arrest Moore after he sold the crack cocaine to the informant.  Mullins advised that the team was to move in and "take down" Moore once the informant gave a

visual signal to confirm that Moore was actually there to make the deal.  The first part of the plan was unsuccessful so the officers turned to the second.

The Dayton Econo Lodge is a U-shaped building with an overhang that juts out along the east side.  It faces Edwin C. Moses, and an access road runs between that street and the hotel.  The road provides access to a McDonald's (to the west of the Econo Lodge), a Wendy's (to the east of the Econo Lodge), and a BP gas station (further to the east of the Econo Lodge).  Detective House arrived in the vicinity of the motel at approximately 7:15 pm in an unmarked City of Dayton vehicle.  After twice moving his car, House parked near the McDonald's drive-through to the west of the Econo Lodge with a view of the informant.

Not long after House parked, Detective Knight came on the radio and informed the team that Moore was arriving in a blue Ford Taurus and that there were three or four occupants in the vehicle.  Shortly thereafter, the Taurus stopped under the overhang and made contact with the informant.  Satisfied that Moore was there to complete the deal, the informant made the signal and then turned to walk toward the hotel.  Mullins instructed the team to "move in."  The plan was to surround the Taurus while Moore was still in front of the Econo Lodge waiting for the informant to return.

It was at this point that the plan went awry and the situation began to escalate.  Instead of waiting for the informant, the Taurus drove through the Econo Lodge parking lot at "normal speed," westbound, in the direction of House and the McDonald's.  Believing that if he continued with the original plan the vehicle would simply drive around him, House positioned his car in the exit that led from the Econo Lodge parking lot onto Edwin C. Moses.  After partially blocking the exit, House got out of his vehicle and walked toward the Taurus as it came to a stop in front of him.  At about the same time, Detective St. Clair, with Sergeant Johns, parked alongside his car, leaving about one car's length between the two.  Because the signal had been given, House believed that the other detectives would converge on the Taurus.

The Taurus came to a stop approximately 30 feet from House's vehicle, giving House a clear view of the driver and passenger and the driver a clear view of him.  House, wearing his badge and his Dayton Police utility vest with "Police" written in reflective lettering, approached the Taurus from the front with his gun drawn, yelling "Dayton Police.  Stop the car."  St. Clair

did the same. When House was approximately ten feet from the stopped Taurus, the driver of the car, later identified as Charles Stargell, "punched the gas" and accelerated.[1] House ran to the left. Realizing he could not avoid being hit, House put his hands on the hood of the Taurus and jumped in the air to ensure that the car would not drive over his body. The Taurus struck House in the right leg as he rolled across the hood to the passenger side of the vehicle. The impact carried House in the direction from which he came, and he landed facing the same direction as the Taurus, which continued to accelerate.

Almost immediately after the car struck House, it struck St. Clair in the hand, prompting him to discharge his weapon. At that point, House did not know where St. Clair was or even that St. Clair had been the one to fire the shot. Nevertheless, based on the fact that House had last seen St. Clair behind him, House believed that St. Clair had fired the shot and had done so in self-defense. In fact, St. Clair was on the opposite side of the vehicle near the rear driver's-side door and testified that he discharged his weapon accidentally.

Within a matter of seconds after being hit, House turned to the left, in close proximity to the passenger-side front window, looked through the sight on his gun at the driver of the Taurus, and fired a single shot. House testified that the only person he could see through the sight was the driver, Stargell; he did not see the person in the front passenger seat. He testified that he took the shot in the belief that he was protecting St. Clair, Johns, Detective Murphy, and Officer Ponichtera, as well as officers and civilians who might have been seriously injured had the car continued on. The bullet struck and killed Derrick Jordan, the front-seat passenger. The Taurus continued between House's and St. Clair's cars, through the McDonald's parking lot, eventually crashing into a tree.

The City of Dayton Police Department charged House and St. Clair with two violations of the City's firearms policy. General Order 3.03-5, Use of Firearms, provides that "An officer will not discharge firearms from or at a moving vehicle unless they reasonably believe that such an action is in defense of human life." Subsection (a) provides that "Officers must use tactical positioning of their vehicles and tactical vehicle approaches in order to minimize the danger

---

[1]There is a dispute as to whether the vehicle accelerated directly at House, or whether the driver turned the wheel left and accelerated at St. Clair. Regardless, the vehicle hit both officers.

presented by occupied vehicles." Subsection (b) provides that "Officers must not deliberately place themselves in the path of a moving vehicle. An officer will attempt to move from the path of the motor vehicle and/or seek cover when possible." The two officers were found not guilty of violating subsection (a) and guilty of violating subsection (b), presumably for approaching the Taurus from the front. House was given a 24-hour suspension.

William Cass, Jr., as administrator of Jordan's estate, brought suit against the City of Dayton, the Dayton Police Department, Detective House, and a John Doe defendant in the Montgomery County, Ohio, court of common pleas. Cass asserted claims under 42 U.S.C. § 1983, alleging that House violated Jordan's Fourth Amendment rights and that the City could be held liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Cass also asserted claims under Ohio law. The defendants removed the suit to the United States District Court for the Southern District of Ohio, and the district court awarded summary judgment to the defendants on all of Cass's claims. The district court held that House did not violate Jordan's Fourth Amendment rights because House's use of force was not objectively unreasonable under the circumstances. In the alternative, the district court held that House was entitled to qualified immunity because Jordan's constitutional rights were not clearly established. On the *Monell* claim, the district court rejected Cass's contention that the police department's after-the-fact failure to discipline House adequately (in the plaintiff's eyes) established a causal nexus between the alleged constitutional violation and the City's actions. The court also granted House statutory immunity on the state-law claims. Cass timely appealed.

## II.

We review a district court's grant of summary judgment *de novo*. *See Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, we construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Cass asserts that summary judgment was improper under *Tolan v. Cotton*, which held that where material facts are disputed—when, for example, there is contradictory testimony

concerning a fact—a court must resolve that dispute in favor of the nonmoving party at the summary judgment stage. 134 S. Ct. 1861, 1866–68 (2014). Unlike in *Tolan*, the material facts in this case are not disputed; this dispute centers on whether those facts, when viewed in Cass's favor, amount to a violation of Jordan's clearly established constitutional rights. This type of dispute is apt for disposition at summary judgment because the only question is whether the defendants were entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020–24 (2014).

## A.

We begin with the § 1983 claims against House in his personal capacity[2] to which House asserted a qualified immunity defense. "'[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of such immunity is to protect officials from "undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806. To ensure robust protection, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There are two general steps to the qualified immunity analysis. The court must determine whether "the facts alleged show the officer's conduct violated a constitutional right" and whether that right was "clearly established." *Saucier v. Katz*, 553 U.S. 194, 201–02 (2001).[3] Cass asserts that the district court erred at both steps of the qualified immunity analysis—that the district court erred in concluding that Jordan's rights were not violated and that House did not violate

---

[2]Cass did not specify whether the claim was brought against House in his individual or official capacity. House did not object on that basis and there is no question that House had "sufficient notice" that he was being sued in his individual capacity, *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001) (en banc), particularly since he asserted a qualified immunity defense, *Shepherd v. Wellman*, 313 F.3d 963, 968 (6th Cir. 2002).

[3]This court has at times applied a third step in its qualified immunity analysis. A court must determine "whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)). In the instant case, this objective reasonableness test collapses into the Fourth Amendment inquiry.

clearly established law. We reach only Cass's first argument. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Although Jordan was not the intended target of House's bullet, Cass's claim on his behalf is properly assessed under the Fourth Amendment. *See Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir. 2000). The Fourth Amendment's prohibition against unreasonable seizures prohibits the use of excessive force against free citizens. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The test is one of objective reasonableness: "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. We assess "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)), among other case-specific factors. *See Ciminillo v. Streicher*, 434 F.3d 466, 467 (6th Cir. 2006). In short, we ask whether the officer's use of force was objectively reasonable in light of the totality of the circumstances as they would have appeared to a "reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

*Tennessee v. Garner* provides the starting point for assessing the use of deadly force against fleeing felony suspects. There, the Supreme Court held that the Fourth Amendment does not permit a police officer to "seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. At the same time, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

Since *Garner*, we have applied a consistent framework in assessing deadly-force claims involving vehicular flight. Although each case is tethered to its specific factual context, the critical question is typically whether the officer has "reason to believe that the [fleeing] car presents an imminent danger" to "officers and members of the public in the area." *Smith v. Cupp*, 430 F. 3d 766, 775 (6th Cir. 2005). An officer is justified in using deadly force against "a driver who objectively appears ready to drive into an officer or bystander with his car." *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012) (citing *Brosseau v. Haugen*, 543 U.S.

194, 197–200 (2004)). But, as a general matter, an officer may not use deadly force "once the car moves away, leaving the officer and bystanders in a position of safety." *Id.*; *see also, e.g., Murray-Ruhl v. Passinault*, 246 F. App'x 338, 344–46 (6th Cir. 2011); *Estate of Kirby v. Duva*, 530 F. 3d 475, 482–83 (6th Cir. 2008); *Sigley v. City of Parma Heights*, 437 F.3d 527, 535–36 (6th Cir. 2006); *Cupp*, 430 F.3d at 774–75. An officer may, however, continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Hermiz*, 484 F. App'x at 16; *see, e.g., Scott v. Clay Cnty.*, 205 F. 3d 867, 877 (6th Cir. 2000); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). In *Cupp*, we explained:

> In [*Scott* and *Freland*], there was no question that the lives of the officers, or the lives of both the officers and members of the public in the area, were endangered by the fleeing suspects. Each suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around. The officers reacted with deadly force only after an extended interaction between police and the suspect proved that the suspect was likely to continue to threaten the lives of those around him in his attempt to escape.

430 F.3d at 775.

Finally, because the "calculus of reasonableness" allows for the fact that police officers must often "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 397 U.S. at 397—an officer does not violate the Fourth Amendment where, although ultimately wrong in his or her assessment of the circumstances, "a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change." *See Cupp*, 430 F.3d at 774–75.

Applying this framework, and cognizant that the ultimate question is one of objective reasonableness, we find that House did not use excessive force. As House approached the stopped Taurus, clearly signaling his status as a City police officer, Stargell accelerated. Despite House's evasive maneuver, House was struck in the leg as he rolled across the hood of the Taurus. Almost immediately after being hit, House heard St. Clair fire his weapon. Based on his assessment of the scene, he believed that St. Clair had fired in self-defense and that Johns and Murphy were also at risk of being struck by the vehicle. It was only at this point—after he

himself had been hit by the Taurus and had heard St. Clair discharge his weapon in what House believed was self-defense—that he attempted to stop the Taurus by shooting at the driver. These facts are not contested in the record. Based on the fact that Stargell had demonstrated that "he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around," *Smith*, 430 F.3d at 775, and based on House's professional assessment of what can only be described as a "tense, uncertain, and rapidly evolving" situation, *Graham*, 397 U.S. at 397, House's use of deadly force was objectively reasonable.

Cass disagrees. He asserts that because House landed facing in the same direction as the Taurus, he should have known that St. Clair was not in immediate danger. But "[i]t is not that easy, particularly in the context of the lightning-quick evolution of this encounter." *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 155 (6th Cir. 2013). House needed to make a split-second judgment, which he did based on his understanding of the scene and his professional training. Cass would have the court substitute its judgment for House's, but the reasonableness inquiry accounts for the fact that officers on the scene must act quickly based on their professional judgment and the facts and circumstances as they then appear. *Graham*, 490 U.S. at 396.

Quite apart from the fact that House reasonably believed St. Clair to be in the direct path of the Taurus, Cass's argument lacks merit. His argument hinges on the proposition that St. Clair in particular and none of the other officers more generally were in the Taurus's *direct* path when House used deadly force. But the inquiry is not nearly so narrow. The question is whether House reasonably believed that the lives and safety of both officers and members of the public "in the area" were in imminent danger. *Cupp*, 430 F.3d at 775. Indeed, this court and the Supreme Court have looked beyond the immediate scene where the driver, like Stargell, "had proven he would do almost anything to avoid capture." *Freland*, 954 F.2d at 347 (noting that, based on suspect's prior interactions with officers, fleeing suspect could have entered neighboring house hoping to take hostages); *Plumhoff*, 134 S. Ct. at 2021 (noting that, based on suspect's prior interactions with officers, it was reasonable to believe that the suspect would resume his flight and pose a deadly threat to others on the road).

In this case, we look no further than the immediate vicinity. Although the Taurus had struck two officers, Cass suggests that the coast was clear for the car to proceed unmolested despite the presence of other officers to effect the arrest. This, of course, was not how the situation appeared in real time. Informed by his knowledge of the circumstances and of police tactics, House reasonably understood that Stargell, in his quest to escape, posed a continuing risk to the other officers present in the immediate vicinity, including Johns and Murphy. Moreover, those officers were not required to step aside and let the Taurus escape, particularly after it had struck two of their fellow officers. *See id.* at 2021–22; *Cupp*, 430 F.3d at 774. In short, "[w]hile it may be easy for [Cass] to say that each officer was safe once the officer was no longer in the direct path of [the Taurus], no reasonable officer would say that the night's peril had ended at that point." *Hocker*, 738 F.3d at 155. Stargell remained behind the wheel, other officers were on the scene, and Stargell had demonstrated a willingness to injure officers trying to prevent him from fleeing.

Cass also makes much of the fact that House violated Dayton Police Department policy by placing himself in the Taurus's path. But "[t]he Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work." *Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 468 (6th Cir. 2007). House's alleged violations of City policy do not change our conclusion that he did not act objectively unreasonably under the circumstances. *See Freland*, 954 F.2d at 347–48.

Finally, Cass asserts that the district court erred in rejecting his contention that House fired the shot out of revenge. In a Fourth Amendment excessive force case, however, the officer's "underlying intent or motivation" is immaterial—the only question is "whether the officer's actions were 'objectively reasonable' in light of the facts and circumstances" then prevailing. *Graham*, 490 U.S. at 397.

**B.**

Because Jordan was not deprived of a constitutional right, Cass cannot prevail on a claim against the municipality predicated on the same alleged constitutional injury. *Scott*, 205 F. 3d at 879.

**C.**

Cass's state-law claims against House are foreclosed by the fact that House did not act unreasonably. *See Burdine v. Sandusky Cnty.*, 524 F. App'x 164, 171 (6th Cir. 2013). Section 2744.03 of the Ohio Revised Code immunizes employees of a political subdivision from civil liability for injuries allegedly caused by conduct undertaken in connection with governmental functions unless the "employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities" or the "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6). Cass does not assert that House acted outside the scope of his employment and, having failed to demonstrate that House's conduct was objectively unreasonable, he cannot demonstrate that House acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *See Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009).

**III.**

For the foregoing reasons, we affirm.