NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0639n.06

No. 14-2337

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ZULEMA RENEE BONNER-TURNER, Individually and as Personal Representative for the Estate of Alphonso Turner, | ) ) ) ) | **FILED**<br>Sep 14, 2015<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| CITY OF ECORSE; GERALD CHAMPAGNE; JAMES FRIERSON; WILLIAM MCCAIG; WILLIAM MARKS; CELESTE GRAHAM, | ) ) ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: SUHRHEINRICH and GRIFFIN, Circuit Judges; and STAFFORD, District Judge.[*]

GRIFFIN, Circuit Judge.

Shortly after his arrest, Alphonso Turner hanged himself in an Ecorse, Michigan jail using a shoelace that normally would have been taken from him during booking for his safety. His widow, as the personal representative of Turner's estate and in her individual capacity, alleges in her complaint that city police officers were deliberately indifferent to Turner's risk of suicide and used excessive force in violation of his constitutional rights. Because the district court erred in granting summary judgment in favor of defendants on several of plaintiff's

_____

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

deliberate indifference claims and one excessive force claim, we reverse in part, affirm in part, and remand for further proceedings.

I.

Alphonso Turner had been diagnosed with paranoid schizophrenia and bipolar disorder. To control the effects of these conditions, he had taken prescription medication for years.

On September 16, 2010, Turner was discharged from a mental health hospital after undergoing treatment. Ten days later, around 2 a.m., after drinking heavily, he told his wife, Zulema Bonner-Turner, that he was suicidal and wanted to go to the hospital. Bonner-Turner called 9-1-1. She had the following conversation with Ecorse Police Department Sergeant James Frierson:

> Plaintiff: I need an ambulance to send to [address]. I need an EMS . . .
>
> Frierson: What's the problem?
>
> Plaintiff: Um, my husband, he's um, having a fit. You know, he walking around here talking about killing people, walking around with gun . . .
>
> Frierson: He has a gun?
>
> Plaintiff: Yes.
>
> Frierson: So you need the police, not the rescue?
>
> Plaintiff: I need somebody to come and get him.
>
> Frierson: All right, what's his name?
>
> Plaintiff: His name's Alphonso Turner.
>
> Frierson: All right, we'll have somebody over there, okay?
>
> Plaintiff: All right.
>
> Frierson: Okay.

Frierson worked at the city jail as a watch commander. It was his duty to answer 9-1-1 calls, dispatch responders, and monitor prisoners. After receiving Bonner-Turner's call, Frierson dispatched responders from the fire department who were cross-trained as emergency medical technicians ("EMTs"). He also dispatched Ecorse Police Officers William Marks and Celeste Graham to "rescue assist." Captain Mark Wilson and Sergeant Jeff Wilson of the fire department testified that the nature of the dispatch was a "medical" run for a "possible suicide" or "attempted suicide."

The EMTs arrived first. Turner was lying face-down in the street for no apparent reason. According to Bonner-Turner, Turner told the rescue team, "I want to go to the hospital. I am suicidal. I am sick." Mark Wilson characterized Turner's words as "mumbo jumbo" and "talking kind of crazy."

Marks and Graham arrived next. They saw Turner lying in the street. Marks testified that although Turner's speech was slurred, Turner was "speaking coherently," and Marks could "sometimes" understand him.

Mark Wilson used his foot to knock a cigar out of Turner's hand. The kick opened some stitches on Turner's hand, causing it to bleed. Turner stood up and told Mark Wilson, "don't touch me, y'all trying to kill me. I just want to go to the hospital. I'm suicidal." Marks later acknowledged that he heard Turner say that he needed "help" and wanted to go to the "hospital."

Turner was uncooperative. He refused to allow anyone to take his vital signs. But, according to Bonner-Turner, Turner again requested to be taken to a hospital, explaining that he had been diagnosed as bipolar and stating: "I'm suicidal, I don't feel good, I'm sick, just take me to the hospital." Marks and Graham were present for those statements. In fact, according to Bonner-Turner, at almost all times, every responder was standing close enough that he or she

could hear anything said by anyone else. It is undisputed that Turner was yelling that he wanted to go to the hospital. According to Turner's son, who was standing nearby, Turner also yelled out, "Fuck you all, fuck life, I just want to die."

Marks and Graham unsuccessfully tried to calm Turner. Bonner-Turner told Graham that Turner was recently released from a mental health hospital and that he had new medications but had not taken them. Marks was standing close enough that he would have heard Bonner-Turner's comments. Bonner-Turner also overheard a member of the rescue team inform Marks or Graham that Turner was "suicidal." Graham testified that she formed a belief at the scene that Turner needed medical attention for his mental health. She later wrote in a police report that she "asked him if he was on medication and [he] replied that he was in fact bi-polar but had not taken his medication."

Turner continued to refuse to allow anyone to take his vital signs. Turner insisted, "I don't have to let y'all do nothing, just take me to the hospital, y'all are trying to kill me." Shortly thereafter, Marks drew and aimed his taser at Turner. But Bonner-Turner and Turner's son begged Marks not to use the taser because Turner was suicidal. Marks put his taser away.

According to Marks, Turner waffled back and forth between wanting to go to the hospital and the jail: "He wanted to be checked out by rescue. Then he didn't want to be checked out by rescue. Then he wanted to go to the jail. Then he wanted to go to the hospital . . . then he'd lay back on his back . . . and say, 'Okay, take me to jail.' It was a circus." According to Graham, Turner said, "Take me to jail, take me to jail."

Considering that it was 2:30 a.m., Marks decided to arrest Turner for disturbing the peace. He handcuffed Turner, put him in a patrol car, and left the scene. Bonner-Turner thought

Marks was taking Turner to the hospital. In total, the events at the Turner home lasted five to ten minutes.

Mark Wilson completed a Wayne County EMS Run Form documenting the events. For the "Primary Complaint," he wrote "attempted suicide," for "Other History," he put "bipolar" "skits" [schizophrenia] and an abbreviation for "paranoia," and noted, "[m]an stated he wanted to go to the hospital."

On the way to the jail—normally a ninety-second drive—Turner began "flipping completely out," and banging his head forcefully against the Plexiglas partition in the patrol car. Marks decided to pull the vehicle over. He tased Turner twice. The first time, there were no other witnesses. The second time, Marks's supervisor, Officer William McCaig, had arrived and witnessed the tasing. These events gave rise to two additional excessive force claims that are not a part of this appeal.

At the jail, Marks and McCaig took Turner into a processing room. Turner was uncooperative in answering booking questions. From the moment he exited the patrol car, Turner had threatened the officers. According to Marks, Turner stated that as soon as his handcuffs were removed, he was going to kill Marks and he was "going to go through" McCaig to do it. Because Turner was uncooperative, they decided to place him in a cell to "cool down." Instead of removing Turner's property according to written procedure as they would normally do in the processing room, the officers placed Turner in a cell with his property, including his clothing and shoes. They did not complete the medical history section of Turner's arrest record or otherwise document his mental health history or his then-current risk of self-harm.

The record includes two jail videos, without audio, one of the processing room and another of the jail hallway. The video of the processing room shows McCaig conducting two

searches of Turner's person. Turner appears to be speaking to, or yelling at, McCaig but allows McCaig to pat him down. The video also documents McCaig pushing a handcuffed Turner face-first into a wall. In the second video, McCaig escorts Turner down a jail hallway. To remove Turner's handcuffs, McCaig turns Turner to face a wall and brings Turner's arms upward behind his body. According to McCaig, as he removed the first handcuff, Turner tensed up as if he were about to "push off." In the video, McCaig uses his left forearm to hold Turner's body against the wall and kicks Turner's feet apart while removing the handcuffs from Turner's right hand. Marks assists by holding Turner's left arm behind Turner's head while McCaig removes the remaining handcuff. Marks then turns Turner toward the cell. Graham is present but does not make physical contact with Turner. In total, the events in the hallway last seventy seconds.

The officers placed Turner in a "detox" cell or "drunk tank" for what was commonly known as a "cool down period." Booking was not complete. The "cool down period" is an unwritten practice employed when "the prisoner is out of control." Normally, pursuant to the city's policy: "[t]he prisoner shall be relieved of all property and thoroughly searched . . . . Prisoners are to be stripped of any item which might be used by the inmate as a weapon or to harm himself, such as a necktie, shoelace, belt, etc." But when officers place an arrestee in "cool down," they do not necessarily take the prisoner's clothing or shoes.

Detox cells are equipped with video cameras monitored at the watch commander's desk. But the video camera in Turner's cell was inoperative because it had been covered with dried toilet paper by a prior inmate two weeks earlier. The watch commander, Frierson (the same officer who had taken the 9-1-1 call), knew it was broken, and later admitted to an investigator that it had been broken for "a while." Director of Public Safety Gerald Champagne similarly

told the investigator that the camera in Turner's cell had not been working for "some[]time." Accordingly, Frierson did not have a visual image of Turner's activities inside his cell.

Calvin Shackelford was detained in an adjacent cell. According to Shackelford's affidavit, Turner was "begging" the officers for medical help because he could not breathe. Shackelford heard Turner ask the officers to take him to the hospital but the officers "just ignored him." Turner "beg[g]ed and yelled for help for at least an hour or hour and a half" and "kept yelling" that he could not breathe. Shackelford did not hear Turner make any threats; he "just kept asking why he was tased and why they [wouldn't] take him to the hospital."

Meanwhile, Marks returned to Turner's home. He informed Bonner-Turner that Turner had been arrested. Bonner-Turner expressed concern that Turner was not at a hospital and stated that he was suicidal. Feeling she could not do anything else about the situation, she asked Marks to inform his boss, Greg Blade—Turner's uncle—that Turner was in custody. When Marks returned to the jail, he did not contact the watch commander, check on Turner, or take any action to relay information that Turner was suicidal.

As the watch commander, Frierson was responsible for monitoring Turner. Frierson testified that around 4:00 a.m. McCaig told him that Turner was in the cell and still had his personal property and clothing. Frierson checked on Turner around 4:30 a.m. because Frierson heard "male voices" and "banging" on the cell walls and doors. According to Shackelford, Turner was "pounding for help for a long time till finally the black man cop [Frierson] went to his cell." Frierson believed that Turner was making the noise. Frierson observed Turner entirely naked in his cell. He did not attempt to take Turner's clothing or shoes. Frierson later explained that he did not remove them because he was "trying to just calm [Turner] down." Turner told Frierson he could not breathe. Frierson responded that Turner should just "lay down" and he

would "have somebody check [him] out, when [he] calm[ed] down." Frierson returned to the watch commander desk. He did not call for medical assistance. Soon after, Frierson left the jail for twenty minutes on a meal break. McCaig was left in charge. Frierson did not give McCaig any specific instructions to monitor Turner. And McCaig did not check on Turner.

Written policy required officers to check on prisoners "at a minimum of [once] every hour." At approximately 5:53 a.m.—at least 75 minutes after his last check—Frierson returned to Turner's cell. Frierson found Turner hanging dead from the ceiling by his shoelace.

Plaintiff filed this lawsuit in federal court. The district court dismissed all state-law claims and plaintiff voluntarily withdrew two federal claims. Without oral argument, the district court granted in part and denied in part defendants' motion for summary judgment, dismissing all but two § 1983 excessive force claims against Marks and McCaig for tasing Turner in the patrol car on the way to the jail. The district court later certified the summary judgment order as a final judgment under Federal Rule of Civil Procedure 54(b) with respect to the dismissed claims. Plaintiff appeals.

## II.

We review a district court's grant of summary judgment de novo. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering whether to grant summary judgment, all reasonable inferences must be made in favor of the non-moving party. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986). We do not make credibility judgments or weigh the evidence. *Moran*, 788 F.3d at 204.

Individual defendants maintain that they are entitled to qualified immunity. Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We analyze qualified immunity in two parts: (1) whether, considering the allegations in a light most favorable to plaintiff, a constitutional right has been violated, and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[1]

A.

Plaintiff's central claim is that defendants were deliberately indifferent to Turner's serious medical needs in violation of the Fourteenth Amendment.[2] Specifically, plaintiff

---

[1]Occasionally our court employs a three-step analysis. Both the two- and three-step frameworks capture the relevant inquiry as announced in *Saucier*, 533 U.S. at 201. *Compare Dunigan v. Noble*, 390 F.3d 486, 491 n.6 (6th Cir. 2004) *with Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005). The third step is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901, 905 (6th Cir. 2004).

[2]Plaintiff asks this court to analyze the medical care claims under the Fourth Amendment's objective reasonableness standard because Turner was a warrantless arrestee who had yet to have a probable cause hearing. Our court has not resolved whether the Fourth Amendment's objective reasonableness standard or the more onerous Fourteenth Amendment deliberate indifference standard governs claims for failure to provide medical care prior to a probable cause determination. *See Boone v. Spurgess*, 385 F.3d 923, 933–34 (6th Cir. 2004); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.3 (6th Cir. 2005); *Smith v. Erie Cnty. Sheriff's Dep't*, 603 F. App'x 414, 418−19 (6th Cir. 2015); *see also Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (holding that the Fourth Amendment governs excessive force claims arising beyond the time of arrest until a probable cause hearing). In this case, because plaintiff survives summary judgment under the more demanding deliberate indifference standard, we do not resolve which standard governs.

maintains that defendants Marks, Graham, and Frierson were deliberately indifferent to Turner's risk of suicide, and defendants Marks, Graham, McCaig, and Frierson were deliberately indifferent to Turner's inability to breathe.

Under the Fourteenth Amendment, the governing standard for a constitutional violation is "deliberate indifference" to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This consists of both an objective and subjective component. The objective component requires a showing that there existed a "substantial risk of serious harm" to a detainee's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).

The second component is subjective: An official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Thus, the subjective component actually has three prongs:

> First, the plaintiff must show that the official subjectively perceived the facts that gave rise to the inference of the risk. Then, the plaintiff must show that the official actually drew the inference, and, importantly, not just that he or she should have done so. Finally, the plaintiff must show that the official consciously disregarded the perceived risk.

*Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 465−66 (6th Cir. 2007) (internal citations omitted). Nevertheless, "a prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to

confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8).

The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836. In other words, a plaintiff "does not need to show that the correctional officers acted with the very purpose of causing harm or with knowledge that harm will result." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 835). Such a standard "satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff to survive summary judgment without proving his or her entire case." *Cooper*, 222 F. App'x at 466−67.

"The line between negligence and deliberate indifference is particularly difficult to draw when the risk at issue is suicide because the officials will necessarily be accused of a failure to act, which usually falls in the domain of negligence." *Id.* at 466. "We have clarified that the proper inquiry in a case where an inmate has committed suicide is 'whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.'" *Id.* (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

It is permissible to infer from circumstantial evidence that a prison official had the requisite knowledge. *Comstock*, 273 F.3d at 703. Although failure to follow administrative policies does not itself constitute deliberate indifference, evidence of such a violation may be considered as evidence of an officer's knowledge. *See, e.g.*, *Phillips*, 534 F.3d at 541.

1.

Plaintiff asserts that defendants Marks, Graham, and Frierson were deliberately indifferent to Turner's risk of suicide. As an initial matter, there is little question that plaintiff has satisfied the objective component. "It is well-established in this Circuit that suicidal tendencies are considered 'serious medical needs.'" *Cooper*, 222 F. App'x at 465 (citing *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). The district court agreed, observing that defendants did not contest that Turner had a serious medical need. Nevertheless, on appeal, defendants argue that plaintiff has failed to satisfy the objective component because Turner's statements that he was suicidal were not corroborated by any "actions consistent with those statements." Defendants' argument misapprehends the objective component and otherwise conflicts with this court's precedent with respect to risk of suicide. The proper inquiry is whether the "medical need at issue is 'sufficiently serious,'" not whether defendants perceived it as such. *See, e.g.*, *Comstock*, 273 F.3d at 702−03 (quoting *Farmer*, 511 U.S. at 834). Plaintiff has satisfied the objective component.

The subjective component is the focus of dispute. We ask whether plaintiff has alleged facts that, if true, show that defendants (1) subjectively perceived facts from which to infer a substantial risk of self-harm to Turner, (2) that they did in fact draw the inference that there was a substantial risk of self-harm, and (3) that they disregarded that risk. *Comstock*, 273 F.3d at 703. We must address each officer individually. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

We agree that the district court did not view all facts in the light most favorable to plaintiff. At this juncture, we take as true (1) Bonner-Turner's testimony that Turner told the responders that he was "suicidal" and (2) that she told Graham, within earshot of the other

officers, that Turner had recently been released from a mental health hospital, had new medication, and was not taking his medication. This evidence, combined with undisputed evidence—including Turner's repeated requests to go to the hospital both at his home and at the jail—satisfies plaintiff's burden because a jury could find that defendants drew the inference that there was a substantial risk that Turner would commit suicide and they disregarded that risk.

The district court readily acknowledged the strength of this evidence. In its opinion granting summary judgment in favor of defendants on all but two claims, it observed: "[T]his Court shall assume that, when viewing the evidence in a light most favorable to Plaintiff, 'a jury could reasonably find that [Turner's] statements and behavior demonstrated a strong likelihood of suicide.'" The district court supported this statement with a footnote:

> The following facts might support such a finding: (a) two of the EMTs testified that they were dispatched on a "medical" run for "possible suicide" or "attempted suicide;" (b) Graham and Marks were dispatched to "assist rescue;" (c) Turner repeatedly stated in the presence of Marks and Graham that he wanted to go to the hospital, and he stated that he was suicidal and wanted to die; (d) Turner was speaking "mumbo jumbo" and "talking kind of crazy" in front of Marks and Graham, (e) Graham's police report states that Turner told her that he was bipolar and had not taken his medication—and that Turner "demanded to be taken to the hospital;" and (f) Mark Wilson's EMS Run Form regarding Turner stated: (1) "attempted suicide" under the caption "Primary Complaint," (2) "bipolar" "skit" [schizophrenia] and an abbreviated version of "paranoia" under the caption "Other History," and (3) "Man stated he wanted to go to the hospital" under the caption "Onset Date/Time."

Nevertheless, the district court concluded:

> Although some of these facts may demonstrate that the Defendant officers were negligent (or even grossly negligent) with respect to ascertaining Turner's mental state, even taken in a light most favorable to Plaintiff, it is unclear that any of the Defendant officers knew or <u>subjectively perceived</u> facts from which they inferred that Turner was suicidal.

We conclude that summary judgment is not warranted on these claims. First, defendants' subjective knowledge of substantial risk may be reasonably inferred from their actual exposure

to Turner's statements and behavior. In that regard, this case is distinguishable from cases in which a detainee's suicide risk is alleged merely through observation of a detainee in detention. *Cf. Galloway v. Anuszkiewicz*, 518 F. App'x 330, 331−35 (6th Cir. 2013) (affirming grant of summary judgment in favor of defendants for failure to establish deliberate indifference).

Indeed, this case is more like *Estate of Carter v. City of Detroit*, 408 F.3d 305, 307−09, 312−13 (6th Cir. 2005), in which our court found actual knowledge of a substantial risk of harm because (1) the decedent told an officer she was experiencing chest pains and needed to go to a hospital, (2) the defendant admitted to personally speaking with the decedent who stated her chest hurt and that the decedent had not taken her "heart" medication, and (3) other inmates heard the decedent crying loudly for help with complaints that her chest hurt and she needed to go to a hospital. The court further held that because there was evidence that the defendant did not order a car to transport the decedent to the hospital, did not inform his replacement of the decedent's illness, and made no record that might have alerted other officers to the problem, a reasonable jury could infer that the defendant had consciously disregarded the risk. *Id.* at 313.

Second, there is sufficient evidence from which a jury could reasonably conclude that each individual defendant perceived facts from which to infer a substantial risk of self-harm to Turner, drew the inference, and disregarded the risk. The following facts, viewed in plaintiff's favor, support such inference.

Regarding Marks's subjective knowledge, he (1) admits that the nature of the dispatch was a "rescue assist," and a rational jury could infer that Marks interpreted the nature of the events as did Mark Wilson as a "medical" run for "possible suicide" or "attempted suicide," (2) witnessed Turner's bizarre behavior, (3) admits he heard Turner ask to go to the hospital and ask for "help," (4) observed Turner engage in self-harm by repeatedly banging his head against

the Plexiglas partition in the patrol car, and (5) was told by Bonner-Turner that Turner was suicidal when Marks returned to the Turner home. A rational jury could also infer that (6) Marks heard Turner stating he was suicidal and wanted to die, and (7) Marks overheard Bonner-Turner tell Graham that Turner was bipolar and had not taken his medication. With respect to disregarding Turner's risk of suicide, Marks (1) arrested Turner instead of taking him to the hospital, (2) tased Turner instead of taking him to the hospital after Turner engaged in self-harm in the patrol car, (3) failed to follow jail protocol by not documenting Turner's mental health history, risk of suicide, or recent self-harm in the patrol car, (4) failed to inform Frierson of Turner's mental health history, risk of suicide, or recent self-harm in the patrol car, (5) failed to follow jail protocol by not removing Turner's clothing or shoelaces, despite knowledge of Turner's mental health history, risk of suicide, and recent self-harm in the patrol car, (6) actively assisted in putting Turner in a cell for a "cool down period" with his clothing and shoelaces, (7) did not check on Turner after placing him in the cell, and (8) after returning to the Turner home and being told by Bonner-Turner that Turner was suicidal, did not check on Turner or inform other officers of Turner's risk of suicide. These facts, viewed in plaintiff's favor, satisfy plaintiff's burden at summary judgment.

With respect to Graham's subjective knowledge, she (1) admits that the nature of the dispatch was a "rescue assist," and a rational jury could infer that she interpreted the nature of the events as did Mark Wilson as a "medical" run for "possible suicide" or "attempted suicide," (2) witnessed Turner's bizarre behavior, (3) admits she heard Turner ask to go to the hospital, (4) heard Turner tell her he was suicidal and had recently been released from the hospital, was bipolar, and had not taken his medication, (5) formed a belief that Turner needed medical assistance for his mental health, and (6) told Turner she would get him help. As to Graham's

disregard of Turner's risk of suicide, Graham (1) did not take Turner to the hospital or ask Marks to take Turner to the hospital, despite knowledge of Turner's mental health history and risk of suicide, (2) at jail, failed to follow jail protocol by not documenting Turner's mental health history or risk of suicide, (3) at jail, failed to inform Frierson or other officers of Turner's mental health history or risk of suicide, (4) observed Marks and McCaig put Turner in a cell with his clothing and shoelaces and failed to intervene, (5) did not encourage anyone to take Turner to the hospital or provide medical care, and (6) did not check on Turner in his cell. These facts likewise satisfy plaintiff's burden at summary judgment.

Finally, Frierson's actions, viewed in plaintiff's favor, also support a reasonable inference that he knew of and disregarded a substantial risk of suicide. Frierson (1) took the 9-1-1 call requesting an ambulance, and a rational jury could infer Frierson's subjective knowledge based on Mark Wilson's characterization of the dispatch (made by Frierson) as a "medical run" for a "possible suicide" or "attempted suicide" as there were no other dispatchers that night, (2) admits to hearing Turner banging on the walls and doors of his cell, yelling that he needed to go to a hospital, and (3) observed Turner's bizarre behavior in custody, including standing completely naked in his cell. With respect to disregard, Frierson (1) did not take Turner to the hospital when requested, (2) failed to follow jail protocol by not monitoring Turner's cell, despite knowing that the video monitor in the cell was broken, (3) failed to follow jail protocol by not monitoring Turner every hour, (4) did not remove Turner's clothing or shoelaces when presented with the opportunity, and (5) did not instruct McCaig or another officer to check on Turner while Frierson left the jail on a break. On these facts, a reasonable jury could find in favor of plaintiff on the subjective component of deliberate indifference.

2.

Next, plaintiff alleges that defendants Marks, Graham, McCaig, and Frierson were deliberately indifferent to Turner's asserted inability to breathe. The parties dispute both the objective and subjective components. We conclude that plaintiff's claims against Marks, Graham, and McCaig were properly dismissed, but plaintiff's claim against Frierson should survive summary judgment.

According to Shackelford's affidavit, Turner told Marks, Graham, and McCaig that he needed medical help because he was having trouble breathing. Shackelford further avers that Turner "begged and yelled for help for at least a[n] hour or hour and a half [and] he kept yelling" that he could not breath and he was "pounding for help for a long time till finally [Frierson] went to his cell." Turner told Frierson that he could not breathe but Frierson instructed Turner to lay down and left. Turner "kept begging and yelling for help until he was silent."

Even viewed in the light most favorable to plaintiff, this claim fails with respect to Marks, Graham, and McCaig. Assuming that plaintiff has satisfied the objective component, in context, a rational jury could not find that Marks, Graham, and McCaig, who had just been interacting with and talking to Turner, subjectively perceived facts from which to infer a substantial risk that Turner could not breathe, did in fact draw the inference, and disregarded that risk.[3]

---

[3]Even viewed under a Fourth Amendment objective reasonableness standard, these claims fail. There is no evidence that Turner had any difficulty breathing until he was placed in his cell. Marks, Graham, and McCaig had interacted with Turner for an extended period of time before he was placed in the cell, and he appeared to be breathing normally at that time. Any failure to respond to Turner's claim that he could not breathe once placed in his cell was not objectively unreasonable under the circumstances.

The circumstances surrounding plaintiff's claim against Frierson, however, are different. Frierson was tasked with monitoring Turner for several hours and he acknowledged that Turner had been yelling and banging for some time. We assume from the Shackelford affidavit that Turner was yelling for help for one to one-and-a-half hours and specifically asked Frierson to take him to a hospital because he could not breathe. Frierson admits that he heard Turner yelling, went to check on him, and told him to lay down so that he would calm down. Frierson never called for help. He did not return to check on Turner to see if he had calmed down. Instead, Frierson left on a break. Nor did he ask McCaig to check on Turner while McCaig covered for Frierson. Ultimately, although this is not plaintiff's strongest claim, a jury could reasonably infer that Frierson was deliberately indifferent to Turner's inability to breathe.

B.

Plaintiff also alleges that defendants Marks, Graham, and McCaig used excessive force against Turner or failed to intervene to prevent the use of excessive force. The district court granted summary judgment in favor of defendants on all excessive force claims except those against Marks and McCaig for tasing Turner in the patrol car. Those claims are not a part of this appeal. The claims now before us are limited to the force captured on video at the jail: (1) force in the processing room by McCaig and failure to intervene by Marks, and (2) force in the jail hallway by McCaig and Marks and failure to intervene by Graham. We agree with plaintiff that the claim against McCaig for use of force in the processing room survives summary judgment. The remaining claims were properly dismissed.

The Fourth Amendment's objective reasonableness standard governs claims for excessive physical force during the course of an arrest, booking, and until a probable cause determination. *Graham v. Connor*, 490 U.S. 386, 396−97 (1989); *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir.

2010). "The question we must ask is whether, under the totality of the circumstances, the officer's actions were objectively reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236−37 (6th Cir. 2007). We consider "the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Id.* at 236. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). An officer may be liable for excessive force for failure to intervene if the officer observed or had reason to know that excessive force would be or was being used, and had both the opportunity and means to prevent the harm from occurring. *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015).

1.

First at issue is McCaig's use of force in the processing room. This event is captured on video. For context, we assume as true the uncontroverted deposition testimony from McCaig and Marks that Turner made verbal threats against the officers from the moment he exited the patrol car at the jail. We also assume that Turner was spitting on the officers. The video corroborates that Turner was moving his mouth and sometimes his head toward McCaig. It also appears to corroborate that Turner spit on McCaig. The handcuffed Turner is otherwise compliant and allows McCaig to search Turner's person. Turner does not appear to resist. Soon after, McCaig shoves the still-handcuffed Turner face-first into the wall as Marks stands nearby.

A jury could find that McCaig's use of force was objectively unreasonable. Turner was handcuffed, not physically resisting, and, even if he had made verbal threats, a face-first shove into a wall was almost certainly gratuitous under the circumstances.

Defendants argue the force was not unreasonable because Turner remained standing the entire time. But gratuitous violence inflicted upon an incapacitated arrestee may be excessive even if the injuries are slight. *See Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 407−08 (6th Cir. 2009); *Pigram ex rel. v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006). In this case, a reasonable juror could find that the shove cannot be reasonably "construed as a means of subduing [Turner]," especially because a reasonable juror could interpret the shove as "not to protect [McCaig], other officers, or the public," but rather an angry response to punish Turner. *See id.*

For purposes of qualified immunity, defendants do not dispute that Turner's constitutional right to be free from excessive force is clearly established. And under these circumstances, any reasonable officer would know that such gratuitous violence violated Turner's constitutional rights. *See, e.g.*, *Morrison*, 583 F.3d at 407−08.

With respect to Marks's failure to intervene, because McCaig's use of force was the first overt use of force that Marks witnessed, Marks had no reason to know that excessive force would be used and therefore lacked an opportunity to intervene. *See Goodwin*, 781 F.3d at 328. This claim was properly dismissed.[4]

2.

Plaintiff's final excessive force claims are against McCaig and Marks in the jail hallway, and against Graham for failure to intervene. Again, the events are captured on video. As above, for context we assume that Turner made verbal threats to the officers and spit on them. Although

---

[4]Plaintiff also argues that McCaig used excessive force in the processing room in moving Turner into the jail hallway. Any unnecessary use of force—i.e. that McCaig may have tugged Turner's hair—was particularly minor and incidental, as opposed to gratuitous force. Under these circumstances, no reasonable juror could find the use of force excessive.

Shackelford's affidavit states that he did not hear Turner make any threats, McCaig and Marks testified that such threats occurred from the moment Turner exited the patrol car, outside of Shackelford's earshot. Defendants argue that the force was necessary to control Turner as the officers escorted him to his cell, and to turn him away from the officers as they removed his handcuffs. McCaig also testified that Turner tensed up once he removed the first handcuff, as if Turner was "about to push off," so McCaig used the "least amount of force [he] had to to control [Turner]." Graham's police report states that Turner "refused to follow a command given by [McCaig] of putting his hand on his head while the handcuffs were being removed. Instead, Turner kept turning around towards [McCaig] while making threats."

The district court correctly dismissed these claims. No reasonable juror could find that the officers used excessive force in light of undisputed testimony that Turner tensed up upon release of the first handcuff and refused to follow McCaig's commands. And because there is no underlying constitutional violation, Graham may not be liable for failure to intervene.

C.

Plaintiff's penultimate claim is one of supervisory liability against McCaig and Frierson for unconstitutional supervision for (1) force used by Marks in the hallway (supervised by McCaig) and (2) Marks's or Graham's failure to take Turner to the hospital (supervised by Frierson). Plaintiff has failed to make the necessary showing to survive summary judgment.

Section 1983 liability must be based on more than respondeat superior or the right to control employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). A supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* "At a minimum a plaintiff must show that the official at least

implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*

With respect to the first claim, there is no underlying constitutional violation for force used by Marks in the jail hallway so McCaig may not be liable as a supervisor. And the surviving excessive force claim in the jail processing room implicates McCaig directly, not as a supervisor.

Regarding the second claim, even viewing the facts in plaintiff's favor, a jury could not infer that Frierson authorized, approved, or acquiesced to Marks's or Graham's failure to provide medical care once they arrived at the jail. Frierson himself may be directly liable with respect to one of the medical care claims, discussed above, but this supervisory liability claim was correctly dismissed and plaintiff expends little effort developing this claim of error on appeal.

Finally, plaintiff argues that the district court erred by dismissing a supervisory liability claim against McCaig related to Marks's tasing of Turner in the patrol car, an underlying claim that is still before the district court. Plaintiff raised this argument in a motion for reconsideration, which the district court rejected on the grounds that plaintiff failed to assert such a claim at summary judgment. Following our review of the record, we find the district court correctly concluded that plaintiff's responsive brief in opposition to defendants' motion for summary judgment did not argue that McCaig was liable as a supervisor; it merely argued liability for failure to intervene. And the supervisory liability section only states that McCaig is liable for authorizing Marks's use of force at the jail, unrelated to the tasing incident. Accordingly, the district court did not err in dismissing this claim.

D.

Plaintiff's final claim of error is that the city of Ecorse and Public Safety Director Champagne are liable for the city's "wide-ranging failure to train its officers" on assessing or documenting risk of suicide.

To establish municipal liability for a failure to train, a plaintiff must show (1) the training program is inadequate to the task the officer must perform, (2) the inadequacy is a result of the municipality's deliberate indifference, and (3) the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). To show deliberate indifference, a plaintiff "'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Alternatively, a single violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.*; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

In this case, plaintiff has not shown a pattern of abuses illustrating the city of Ecorse was on notice that its training was deficient. Plaintiff's brief might be read as arguing that a single violation triggers municipal liability, but its cursory analysis falls short of marshaling the evidence necessary to show that the training was so deficient and so likely to cause injury that the failure to train was obvious. The district court did not err in granting summary judgment to defendants on this claim.

III.

For these reasons, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.