NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0323n.06

No. 17-1793

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

EDWARD OTTO RUEMENAPP,      )
     )
     Plaintiff-Appellant,      )
     )
v.      )
     )
OSCODA TOWNSHIP, MICH.,      )
     )
     Defendant,      )
     )
     )
GREG ALEXANDER and GERALD      )
SOBOLESKI, in their individual and      )
personal capacities,      )
     )
     Defendants-Appellees.      )
     )

**FILED**
Jun 28, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:      DAUGHTREY, GIBBONS, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Shortly after Oscoda Township police officers Greg Alexander and Gerald Soboleski[1] arrived on the scene of a heated, yet nonviolent, landlord-tenant dispute, the situation escalated to the point that the officers pushed plaintiff Edward Ruemenapp into a wall, allegedly to facilitate handcuffing him. Ruemenapp sustained abrasions to his face and filed a 42 U.S.C. § 1983 excessive-force claim against the officers and the township. The district court granted the defendants summary judgment, and Ruemenapp now appeals only the dismissal of his claims against the two officers. Because Ruemenapp has

---

[1]The district court opinion and the parties' briefs refer to defendant Soboleski as "Sobolewski." When deposed during discovery, however, the officer clearly indicated that he spelled his last name "S-O-B-O-L-E-S-K-I." We thus will refer to the defendant with the spelling of his surname that he himself provided.

identified genuine disputes of material fact that make the grant of summary judgment to those officers inappropriate, we reverse and remand the case to the district court for such further proceedings as are necessary.

**FACTUAL AND PROCEDURAL BACKGROUND**

Many of the facts in this litigation are not disputed. For example, the parties do not contest that, in addition to being employed as a stockroom clerk in the shipping department of Kalitta Air, Edward Ruemenapp is the owner of the Oscoda Resort and Motel in Oscoda, Michigan. As the owner and manager of the resort, Ruemenapp entered into a one-year lease in July 2014 with Kristina Reker, who was to pay $600 per month to rent Unit 2 of the establishment. Although Reker paid the required rent through February 28, 2015, on Saturday, February 21, 2015, she left the unit and told Ruemenapp and the resort's handyman, "You're going to have another [apartment] to clean." The following day, February 22, Reker also informed Ruemenapp's daughter "that she was done. [Ruemenapp] could do anything [h]e wanted with that apartment."

Three days later, on Wednesday, Ruemenapp's daughter mentioned to her father the conversation she had had with Reker. Believing that Reker "was done" with the apartment, Ruemenapp locked the door to Unit 2, peered through the window, and noticed that "[t]he floors were totally littered with paper and waste and trash, holes in the walls, holes in the doors, sliding doors, closet doors." Ruemenapp then called Reker at her place of employment to inquire "why she'd left, destroyed the apartment, and left it in the condition that she had." The conversation became heated, and Ruemenapp admitted that he called Reker a number of derogatory names before hanging up on her.

On the morning of Saturday, February 28, Ruemenapp entered Unit 2 and got a closer look at the damage he had observed through the window on the previous Wednesday. He also stated that, at that time, he did not see any of Reker's personal property in the unit, other than dirty dishes on the counter. He thus rekeyed the lock on the door and returned to his own residence on the property. That evening, however, Reker returned to the unit to retrieve additional items to take to her new residence. Because she was unable to access the unit, she asked Ruemenapp to let her in her apartment. When he refused to do so, informing her that she had abandoned the unit, Reker called the local police to enlist their assistance in recovering her belongings.

Officers Alexander and Soboleski responded to the call and, upon arriving at the Oscoda Resort and Motel, spoke with Reker, who informed them that the locks on her apartment had been changed and that she was unable to remove her possessions from the residence. Alexander and Soboleski thus approached Ruemenapp and inquired why Reker was locked out of her apartment when she had paid rent that entitled her to occupancy through the end of that day. Ruemenapp responded that Reker had abandoned the property and, consequently, had no further right to gain entry to the unit.

In their descriptions of the ensuing events, the versions of the facts offered by Alexander and Soboleski differ drastically from the version offered by Ruemenapp. According to Alexander and Soboleski, when they asked Ruemenapp why he refused to allow Reker into the apartment, Ruemenapp "became belligerent quickly, started screaming obscenities that she was not going back in that apartment," and began pointing his finger in Soboleski's face from six inches away. When Ruemenapp continued to point at Soboleski, the officer told Ruemenapp "to take his finger out of [the officer's] face," and Alexander grabbed Ruemenapp's right arm and pulled it into a wristlock while Soboleski grabbed Ruemenapp's other arm. Soboleski stated that Ruemenapp

then pulled his arm away from Alexander, even though Alexander did not believe that he ever lost contact with Ruemenapp's arm, and Soboleski himself later revised his testimony to state that he did "not recall if [Alexander] lost contact with [Ruemenapp's] arm or not." Nevertheless, Alexander spun Ruemenapp around, pushed him against a wall, handcuffed him, and arrested him for disturbing the peace and for assaulting, resisting, or obstructing a police officer.

During his deposition, Alexander claimed that he did not push Ruemenapp's face into the wall, but rather "pushed from the center of [Ruemenapp's] back into the wall, so his chest would have had contact." He further claimed that any injuries to Ruemenapp's face did not result from him pushing Ruemenapp's face into the siding covering the wall but "[f]rom when [Ruemenapp] was moving his head back and forth, attempting to negotiate with [the officers] about going to jail."

The proof offered by Ruemenapp paints a much different picture—one of overly aggressive, vindictive police officers frustrated by nonviolent resistance to their requests. Contrary to the portrayal of the incident by Alexander and Soboleski, Ruemenapp denied acting belligerent in the presence of the officers and denied ever pointing his finger at Soboleski. Instead, Ruemenapp maintained that he explained calmly to the police that Reker had abandoned her apartment and thus no longer had any right to enter the premises. He further asserted that after denying the officers' request to enter and inspect the unit, he turned to walk away, but Alexander physically blocked his retreat. At that point, Ruemenapp turned, pointed up the sidewalk toward Unit 2, and exclaimed, "That bitch has no business even being here." Although Ruemenapp was adamant that he never pointed his finger toward either officer, he claimed that Alexander then reached for him, and Soboleski ordered Ruemenapp to place his hands behind his back because he was under arrest. Ruemenapp claimed that he then attempted to ask, "What are you arresting me

for?" After speaking only the first two words of the question, however, he lost consciousness, only to regain it moments later when he found himself pushed against a building with Alexander pinning his face against the wall and with his cheek and jaw bleeding from contact with the siding covering that surface. According to Ruemenapp, the officers did not inform him at that time of the specific charges against him, but when Alexander noticed that Ruemenapp was wearing a Kalitta jacket, the officer asked him whether he worked for that company. When Ruemenapp responded affirmatively, Alexander inquired whether Ruemenapp would lose his job if charged with a felony. Ruemenapp answered, "Probably," and Alexander stated, "Then I'm charging you with a felony."

Portions of Ruemenapp's account were corroborated in the sworn declaration of James Merritt, who at that time resided in Unit 4 of the Oscoda Resort and Motel. In that declaration, Merritt claimed that his front door was opened slightly at the time Ruemenapp was engaged in conversion with Alexander and Soboleski but that he never heard any yelling coming from outside. He did see Ruemenapp "point in the direction of [Kristina Reker] who was standing in the parking lot talking on her phone." He also observed one of the police officers grab Ruemenapp "and push him into the side of the building," leaving "a blood spot on the side of the building where Mr. Ruemenapp's head hit the wall." Finally, Merritt declared that he heard Ruemenapp utter a muffled, "I'm not resisting. I'm not resisting," and the officers saying, "Stop resisting. Stop resisting," even though "Ruemenapp was not resisting."

Ultimately, the prosecuting attorney entered an order of *nolle prosequi* conditioned on Ruemenapp's execution of a Deferred Prosecution Agreement. In that agreement, Ruemenapp "admit[ted] that he did obstruct or oppose Gregory Alexander, a police officer of the Oscoda Township Police Department that [Ruemenapp] knew or had reason to know was performing his

duties." After Ruemenapp fulfilled the requirements of the agreement, the charges against him were dropped. He then filed this lawsuit, raising claims of excessive force, unreasonable seizure without probable cause, false arrest and imprisonment, malicious prosecution under both state and federal law, and failure of Oscoda Township to train or supervise its law enforcement employees properly.

The parties eventually stipulated to the dismissal of all counts except those alleging the use of excessive force by Alexander and Soboleski and the failure of Oscoda Township to train and supervise its officers properly. The defendants moved for summary judgment in their favor on the remaining counts; the district court granted the motion and dismissed the complaint with prejudice. In doing so, the district court noted that even if the force exerted upon Ruemenapp were to be considered excessive, the individual defendants still would be entitled to summary judgment because Alexander and Soboleski "would be protected by qualified immunity" because "the unreasonableness of the force used was not clearly established at the time the arrest occurred." Ruemenapp now appeals, challenging only the grant of summary judgment to defendants Alexander and Soboleski on his excessive-force claim.

## DISCUSSION

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-

moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

Thus, in bringing his claim under 42 U.S.C. § 1983, Ruemenapp must establish at least a genuine dispute of fact as to whether the defendants, acting under the color of state law, deprived him of a right secured by the constitution or laws of the United States. *See, e.g.*, *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Moreover, when we are presented with a § 1983 claim against police officers who have invoked the defense of qualified immunity, we "must answer two questions: (1) whether the facts that a plaintiff has . . . shown at the summary judgment stage make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of [the defendants'] alleged misconduct." *Smith v. City of Wyoming*, 821 F.3d 697, 708 (6th Cir. 2016) (citations and internal quotation marks omitted).

**Violation of a Constitutional Right**

The Fourth Amendment to the United States Constitution prohibits "the use of excessive force by arresting and investigating officers." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). To determine whether the force used in any arrest exceeded that allowed by the Fourth Amendment, we must decide "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). The defendants argue, however, that we need not address Ruemenapp's excessive-force allegation because that claim is barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the

conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87 (citation and footnote omitted). According to the defendants, Ruemenapp conceded in his Deferred Prosecution Agreement that he violated the provisions of Michigan Compiled Laws § 750.81d(1) by obstructing or opposing Alexander. The defendants thus submit that *Heck* forecloses any argument by Ruemenapp that he did not engage in actions justifying the use of force against him. This line of argument is unavailing for at least two reasons.

First, the Deferred Prosecution Agreement was crafted—either carefully or sloppily—to avoid using specific language that could derail Ruemenapp's excessive-force claim. The Michigan statute that Ruemenapp was charged with violating, Michigan Compiled Laws § 750.81d, provides, in pertinent part, that "an individual who assaults, batters, wounds, *resists, obstructs, opposes*, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony." Mich. Comp. Laws § 750.81d(1) (emphasis added). The statute also defines the term "obstruct" to include "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a). Because Ruemenapp did not admit to resisting Alexander in his Deferred Prosecution Agreement but, rather, only to *obstructing or opposing* him, the agreement legitimately could be construed to hold Ruemenapp to an admission that he failed only "to comply with a lawful command." Such a failure, absent physical resistance to a law enforcement official, would not necessarily justify a use of force by an arresting officer.

Second, an examination of our binding precedent highlights the error in the defendants' attack on Ruemenapp's excessive-force claim. For example, in *Schreiber v. Moe*, we explained that "[t]he *Heck* doctrine applies only where a § 1983 claim would '*necessarily*' imply the

invalidity of a conviction." 596 F.3d 323, 335 (6th Cir. 2010) (citation omitted). "[I]n Michigan, one can be convicted under § 750.81d(1) simply for a 'knowing failure to comply with a lawful command,' Michigan Compiled Laws § 750.81d(7)(a), and the mere failure . . . to obey a police order" does not render reasonable whatever degree of force an officer exerts upon an arrestee. *Id.* at 334. Rather, there are only two scenarios under which an excessive-force claim necessarily would conflict with a conviction under § 750.81d(1). "The first is when the criminal provision makes the lack of excessive force an element of the crime. The second is when excessive force is an affirmative defense to the crime." *Id.* (citations omitted). But "[n]othing in the text of Michigan Compiled Laws § 750.81d(1) . . . suggests that the state must prove as an element of the crime that the police did not use excessive force. . . . Furthermore, one recent Michigan case has strongly suggested that excessive force by the police is not a defense to a resisting-arrest conviction." *Id.* (citations omitted). Ruemenapp's acquiescence to the terms of the Deferred Prosecution Agreement thus did not preclude him bringing an excessive-force claim against Alexander and Soboleski.

We thus must turn to an examination of whether, under the facts of this case, the force used by defendants Alexander and Soboleski in arresting Ruemenapp can be deemed objectively reasonable. Such a determination of reasonableness must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A proper application of the test requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). Furthermore, an excessive-force claim will not fail simply because the plaintiff did not suffer serious injury, but may succeed "even where the physical

contact between the parties did not leave excessive marks or cause extensive physical damage." *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999) (citation omitted). "In determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010) (citations and internal quotation marks omitted).

An examination of the three factors set forth in *Graham* to test the reasonableness of police action must begin with a recognition that the crime with which Ruemenapp was charged in this case was a minor one. Indeed, the district court specifically recognized as much, and the defendants do not contest that determination on appeal.

Additionally, reasonable officers could not have believed that Ruemenapp "pose[d] an immediate threat" to their safety or to the safety of other individuals. At oral argument in this matter, defense counsel asserted that Ruemenapp is a "large man" and intimated that the defendant officers were of relatively smaller stature and build and thus could have been intimidated by Ruemenapp's very presence. That characterization is belied by the facts in the record, however. At the time of the incident giving rise to this lawsuit, Ruemenapp was less than one month away from turning 59 years old, stood a mere five-feet-eight-and-one-half inches tall, and weighed only 157 pounds. Although the record does not provide details regarding Soboleski's age, height, and weight, Alexander testified that at the time of the confrontation he (Alexander) was approximately 23 years old, was six-feet-two-inches tall, and weighed 180 pounds.

Despite the disparities in age and size between Ruemenapp and the two armed officers, Alexander nevertheless testified during his deposition that he feared "that there was a possibility that Mr. Ruemenapp would strike [him] or [his] partner." According to Alexander, the sole basis

for that fear was the allegation that Ruemenapp pointed his finger inches away from Soboleski's face. At this stage of the proceedings, however, we are required to view all facts in the light most favorable to the plaintiff, and those facts, as related by Ruemenapp, indicate that Ruemenapp never pointed his finger at Alexander or at Soboleski. The existence of this genuine dispute of material fact thus should have precluded the district court from finding that the defendants felt any justifiable threat to their safety during their encounter with Ruemenapp.

The third *Graham* factor to be considered when determining the reasonableness of force used during an arrest—the arrestee's active resistance or attempt to flee—also weighs against the defendant officers in this case. There is no dispute that Ruemenapp did not attempt to flee from the officers. Consequently, the defendants' use of force could be justified only if Ruemenapp "actively resist[ed] arrest." Again, however, a genuine dispute of material fact militates against a grant of summary judgment to Alexander and Soboleski on this ground. Although Soboleski first claimed that Ruemenapp pulled his arm away from Alexander while the officer was attempting to handcuff him, he later backtracked from that assertion, and Alexander himself claimed that he did not think that he ever lost his grip on Ruemenapp's arm. Furthermore, Ruemenapp disputed the officers' version of the facts, claiming that he sought only to inquire as to the basis for arrest and even told the officers, "I am not resisting." In his declaration, Merritt corroborated that claim, stating that Ruemenapp repeatedly told the officers, "I'm not resisting," and, in fact, did not offer any resistance to them. Given such contradictory versions of the events, a determination of the truth of the parties' claims should be made by a finder-of-fact, making summary judgment inappropriate.[2]

---

[2] The defendants make much of the fact that Ruemenapp alleges to have lost consciousness for a brief period of time during the arrest. They argue that, if true, that loss of consciousness means that Ruemenapp could not have

It is true that evidence that could be introduced at a trial might establish that the force used by Alexander and Soboleski to handcuff and arrest Ruemenapp was reasonable under the circumstances. A finder-of-fact also could conclude, however, that Ruemenapp never pointed his finger toward an officer; that he did not pull his arm away from Alexander; and that Ruemenapp's face was "plastered against the wall being held, pinned against the wall, with [his] cheek against the wall." Such a finding necessarily would contradict Alexander's self-serving explanation that the officer pushed Ruemenapp "from the center of his back into the wall, so his chest [and, presumably, not his head] would have had contact." And such evidence, if believed by a jury, would justify a conclusion that excessive force was used to subdue an unarmed, non-menacing, slightly-built, almost-59-year-old man.[3]

Possibly because they recognize the divergence in the accounts of the February 28, 2015, encounter offered by the opposing parties—factual differences that generally result in the denial of requests for summary judgment—the defendants seek to justify Alexander and Soboleski's actions by pointing to other cases in which tactics used by the police were found *not* to constitute excessive force. Of the six such cases cited by the defendants, however, five are unpublished decisions from this court and thus have no precedential value and "are never controlling authority." *Fonseca v. Consol. Rail Corp.*, 246 F.3d 585, 591 (6th Cir. 2001). In any event, each of those five

---

known all that happened during the encounter and thus that he could not offer any evidence to dispute the defendants' version of events. Ruemenapp's account of the incident was corroborated in large part by the declaration of Merritt, however. Furthermore, the onset of the claimed exercise of excessive force by the defendants occurred when the officers first applied force to subdue an individual who was not threatening them in any way, a time when Ruemenapp claims to have been in possession of all his faculties.

[3]It is worth noting that the defendants' assertion that they did not hold Ruemenapp's head against the wall would lead to an absurd explanation for Ruemenapp's injuries. If, as claimed by the officers, they did not press Ruemenapp's head against the wall, and if Ruemenapp did indeed turn his head to try to convince the officers not to arrest him, the injuries suffered by the plaintiff could have occurred only by Ruemenapp failing to tilt his head backwards in a natural motion before turning to speak to them and instead choosing to scrape his own face repeatedly along the wall. It is difficult to understand how that conclusion is plausible, but, in any event, it cannot support the officers' position *as a matter of law*.

unpublished cases presents a factual scenario much different from that now before this court, such that any reliance upon those cases by the defendants is misplaced.

In two of the unpublished opinions, *Lee v. City of Norwalk*, 529 F. App'x 778 (6th Cir. 2013), and *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400 (6th Cir. 2015), video evidence established beyond dispute that the actions of the defendants in those cases were justified because the plaintiffs had threatened the arresting officers. In *Bozung v. Rawson*, 439 F. App'x 513 (6th Cir. 2011), the actions of the defendant police officer in taking Bozung to the ground to handcuff him were deemed appropriate, not only because of Bozung's failure to comply with police directives, but also because Bozung had an outstanding arrest warrant and exhibited signs that he had been operating a motor vehicle while intoxicated. And in both *Wells v. City of Dearborn Heights*, 538 F. App'x 631 (6th Cir. 2013), and *Bolden v. City of Euclid*, 595 F. App'x 464 (6th Cir. 2014), force was used to subdue the plaintiffs only after those plaintiffs made moves—reaching into a pocket for an object and reaching toward a loveseat that could have concealed a weapon—that caused the officers to fear for their safety.

Even the one published opinion from this court that the defendants cite in support of their position involves actions by an arrestee that were far more egregious than are present in this case. In *Dunn v. Matatall*, 549 F.3d 348 (6th Cir. 2008), as in *Lee* and *Bonner-Turner*, the acts of the defendant officer were captured on video, thus ensuring that the material facts were not in genuine dispute. That video showed that Dunn led the police on a two-minute car chase during which Dunn failed to obey three traffic signs. *Id.* at 350-51. After Dunn finally came to a stop, two police officers approached the car and pulled Dunn from the driver's seat. *Id.* at 351. In the course of being removed from his vehicle, Dunn lost his balance and fell to the ground, fracturing his femur. *Id.* at 351–52. Despite the severity of the injury suffered by Dunn, the force applied by

the officers was not deemed excessive given that the offense that led to the arrest was not a minor one, that Dunn posed a threat to the officers and the public, and that he resisted arrest by failing to stop when ordered to do so. *Id.* at 354. "[G]iven the heightened suspicion and danger brought about by the car chase and the fact that an officer could not know what other dangers may have been in the car, forcibly removing Dunn from the car to contain those potential threats was objectively reasonable." *Id.* at 355.

Such a justification for a resort to force is not present here, however. Viewing the disputed facts in the light most favorable to him, we conclude that Ruemenapp did not disregard any directives from Alexander and Soboleski; he was not accused of a serious crime; he did not verbally or physically threaten the officers; and when told that he was under arrest and that he should put his hands behind his back, was not even able to ask why he was being arrested before he was pushed into a wall and pinned there with his face against an abrasive surface. If Ruemenapp's version of the events is to be believed by a factfinder, such an overreaction by trained law enforcement officers to a minor dispute would constitute unconstitutionally excessive force.

**Clearly Established Law**

Even if Ruemenapp is able to establish that Alexander and Soboleski violated his constitutional right not to be subjected to excessive force during an arrest, the officers would be entitled to qualified immunity if that right were not clearly established at the time of the violation. "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (citations omitted). But "it is not enough that a plaintiff establishes that the defendant's use of

force was excessive under the Fourth Amendment; to defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." *Id.* at 605. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even so, a plaintiff need not identify a case with the exact same fact pattern or even "fundamentally similar" or "materially similar" facts. Rather "the salient question . . . is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [a plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Although the "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, we have held that "[c]ases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). Crediting Ruemenapp's version of the events, as we must at this stage of the litigation, it is clear that Ruemenapp posed no physical threat whatsoever to the two officers. He committed no crime by refusing Reker and the officers entry into Unit 2, and he was not "being aggressive in any way" and "was not resisting" the officers. In such a situation, it should have been clear to Alexander and Soboleski that they could not use any force whatever to detain or restrain Ruemenapp. In any event, the force that would be considered reasonable under these circumstances necessarily falls short of pushing him into a wall and pinning him there in such a manner that any head movements on his part scraped the skin off the side of his face. Because the "contours" of Ruemenapp's right not to be subjected to excessive force during an arrest were

sufficiently clear in February 2015, Alexander and Soboleski should have understood that the aggressive actions they took would violate a clearly established right.

## CONCLUSION

As a result of actions that followed a dispute over a tenant's right to enter an apartment unit that allegedly had been abandoned, Edward Ruemenapp entered into a Deferred Prosecution Agreement whereby he admitted "that he did obstruct or oppose" Officer Alexander in the performance of police duties. Significantly, however, Ruemenapp did not admit to "resisting" arrest under Michigan law. At the time of the relevant events in this case, the principle was well-established in this circuit that individuals who pose no safety risk to arresting officers or other individuals cannot be subjected to gratuitous violence during an arrest. Because genuine disputes of fact regarding whether Ruemenapp threatened the arresting officers or disregarded their directives exist in this case, the district court erred in granting summary judgment to the individual defendants on Ruemenapp's §1983 claim of excessive force. We thus REVERSE the judgment of the district court and remand this matter for such further proceedings as are necessary.